REVISED OCTOBER 8, 2002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 01-50591

DANIEL M PEREZ

Plaintiff - Appellant

v.

REGION 20 EDUCATION SERVICE CENTER

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas, San Antonio

September 20, 2002

Before KING, Chief Judge, and SMITH and PARKER, Circuit Judges.

KING, Chief Judge:

Plaintiff-Appellant Daniel M. Perez ("Perez") filed suit against Defendant-Appellee Region 20 Education Service Center ("Region 20") for alleged violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 (2000), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 (2000), and the Texas Whistleblower Act, TEX. GOV'T CODE ANN. § 554.002 (Vernon 1994 & Supp. 2002). The district court granted summary judgment in favor of Region 20 and Perez appeals. We AFFIRM.

## I.  FACTUAL AND PROCEDURAL HISTORY

On October 22, 1990, Perez began working for Region 20 as a

Data Processing Specialist. Region 20 is one of several Education Service Centers ("Centers") charged with administering statewide educational programs and supporting local school districts. In 1991, Perez was promoted to the position of Senior Analyst Specialist II in the Regional Service Center Computer Cooperative ("RSCCC") systems group.

Perez wished to become a Database Administrator for the RSCCC group. Unlike other computer groups at Region 20, the RSCCC group did not have a Database Administrator position. Perez began taking on some database administration duties. These duties were not part of Perez's job description, but employees at Region 20 often took on duties outside of their job descriptions. Perez submitted a request to Region 20 asking to be promoted to, or reclassified as, a Database Administrator because it was a higher-level position than Senior Analyst Specialist II. Perez's request was not granted because there was no Database Administrator position available in the RSCCC group, but Perez was told that if the position was ever approved and funded for his group, he would get the position.

In June 1998, Perez filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), claiming that Region 20 discriminated against him on the basis of national origin in failing to promote or reclassify him.

In late 1997, Perez began experiencing stress and depression; by January 1998, though, Perez received a clean bill of health. In June 1998, Perez was treated for stomach problems and work-related stress. Perez then told Region 20 that he was

having medical problems and submitted certification of anxiety, depressive disorder, dysthemia, and stress. Perez's therapist noted that his condition was not chronic or incapacitating but nonetheless recommended that Perez's work schedule be limited to 37.5 hours per week. Region 20 limited Perez's work schedule until April 1999, when Perez's doctor released him to work overtime under certain conditions.

Though Perez had previously received positive performance reviews, Perez's annual performance review in August 1998 contained several negative comments. In March 1999, Perez received a memo from a supervisor stating that his performance was substandard and warning of possible consequences. In June 1999, Perez received two further memos documenting problems with his work performance and hours. Perez was discharged on July 1, 1999.

Perez responded to his discharge by filing several complaints against Region 20. Region 20 does not have a formal procedure for an employee to appeal his termination, but it allowed Perez to file a grievance. The grievance committee ruled against Perez. Perez also filed a grievance with the Commissioner of Education; that grievance was ultimately dismissed due to lack of jurisdiction. In July 1999, Perez filed a second EEOC complaint, alleging that: (1) Region 20 discharged him due to his Hispanic national origin; (2) Region 20 discriminated against him because of his mental illness disability in violation of the ADA; and (3) Region 20 discharged him in retaliation for filing a previous EEOC complaint. The

EEOC denied Perez's charges of discrimination and retaliation and informed Perez of his right to sue Region 20.

Perez filed suit in Texas state court, alleging that Region 20 violated Title VII, the ADA, and Texas state law. Specifically, Perez al

leged: (1) Region 20 discriminated against him on account of his Hispanic national origin, in violation of Title VII, when it failed to grant his request to reclassify his position or promote him; (2) Region 20 discharged him in retaliation for filing his charge of discrimination with the EEOC in violation of Title VII; (3) Region 20 discharged him because of his Hispanic national origin in violation of Title VII; (4) Region 20 discriminated against him due to his mental illness disability in violation of the ADA; and (5) Region 20 discharged him in retaliation for reporting the sexual harassment of another Region 20 employee in violation of the Texas Whistleblower Act. Region 20 removed the lawsuit to federal district court.

The district court granted summary judgment for Region 20 on all claims. Perez appealed.

## II. STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo, applying the same standards as the district court. Daniels v. City of Arlington, 246 F.3d 500, 502 (5th Cir.), cert. denied, 122 S. Ct. 347 (2001). Summary judgment should be granted if there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In determining if there is a genuine issue of

material fact, the court reviews the evidence in the light most favorable to the non-moving party. Daniels, 246 F.3d at 502.

A genuine issue of material fact exists when there is evidence sufficient for a rational trier of fact to find for the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). When the non-moving party bears the burden of proof on a claim, the moving party may obtain summary judgment without providing evidence that negates the non-moving party's claim. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-25 (1986). Rather, the moving party need only highlight the absence of evidence in support of the non-moving party's claim. See id.

### III. DISCUSSION

Perez raises five issues on appeal. He argues that: (1) Region 20 failed to promote or reclassify him on the basis of his Hispanic national origin in violation of Title VII; (2) Region 20 discharged him in retaliation for making an EEOC complaint in violation of Title VII; (3) Region 20 discharged him on account of his Hispanic national origin in violation of Title VII; (4) Region 20 discriminated against him due to his mental illness disability in violation of the ADA; and (5) Region 20 discharged him in retaliation for reporting sexual harassment in violation of the Texas Whistleblower Act. We consider each claim in turn.

### A. Title VII Failure to Promote Claim

Perez first contends that Region 20's failure to promote him to the position of Database Administrator violates Title VII's prohibition of discrimination in employment on the basis of

national origin.  See 42 U.S.C. § 2000e-2(a) (2000).  To make out a prima facie case of discrimination based on failure to promote, Perez must show that: (1) he belongs to a protected class; (2) he was qualified for the job he sought; (3) despite his qualifications, Perez was rejected; and (4) after his rejection, the position remained open and Region 20 continued to seek applicants from persons of Perez's qualifications.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Bennett v. Total Minatome Corp., 138 F.3d 1053, 1060 (5th Cir. 1998).  If Perez establishes a prima facie case, the burden shifts to Region 20 to articulate a legitimate, non-discriminatory reason for Perez's rejection.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); McDonnell Douglas Corp., 411 U.S. at 802.  If Region 20 articulates a non-discriminatory reason, Perez must then show that Region 20 did intentionally discriminate, which he may do by demonstrating that Region 20's proffered reason is simply a pretext for discrimination.  See Reeves, 530 U.S. at 143, 146-48.

The district court found that Perez had made out his prima facie case, but that Region 20 had articulated a legitimate, non-discriminatory reason for its failure to promote Perez.  We bypass the serious question whether Perez even met his prima facie burden and address Region 20's articulated reasons for its failure to promote or reclassify Perez.

Region 20 argues, and presented summary judgment evidence to the effect that, it did not promote Perez or reclassify his position because the position of Database Administrator within

the RSCCC group was never approved for funding and, therefore, the position did not exist.  The district court found this to be a legitimate, non-discriminatory reason for the failure to promote Perez and found that Perez had failed to present sufficient evidence to suggest that Region 20's stated reason was false.  Perez notes only that another software group at Region 20 did contain a Database Administrator position and that other employees (two Anglo males, one Hispanic woman, one African-American male, and one Asian-American woman) were reclassified. Neither fact, nor the argument that underlies them, addresses the inescapable fact that, as Perez admits in his brief, "[a]t the time [he] began requesting the promotion/reclassification, his funded software area (RSCCC group) did not have the position of Database Administrator."  The nonexistence of an available position is a legitimate reason not to promote.  See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 n.44 (1977) (finding that the "absence of a vacancy in the job sought" is a legitimate reason for not hiring a person for a position).  As Perez produced no evidence to disprove this legitimate non-discriminatory justification for Region 20's failure to promote or reclassify him, the district court correctly granted summary judgment on Perez's Title VII failure to promote claim.

**B.  Title VII Discharge Claims**

Perez next makes two Title VII claims related to his discharge.  First, he argues that he was discharged in retaliation for filing his complaint of discrimination with the EEOC.  Second, he contends that he was discharged on account of

his Hispanic national origin.

Title VII prohibits retaliation against employees who engage in protected conduct, such as filing a complaint of discrimination.  See 42 U.S.C. § 2000e-3(a) (2000).  To make out a prima facie case of retaliation, Perez must show: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal nexus exists between the protected activity and the adverse employment action.  Gee v. Principi, 289 F.3d 342, 345 (5th Cir. 2002).  Once this prima facie burden is met, retaliation claims utilize the same burden-shifting approach as do failure to promote claims.  Id.

Both parties agree that Perez satisfied the first two elements of a prima facie case by providing evidence that Perez filed a complaint with the EEOC (a protected activity) and that he was terminated on July 1, 1999 (an adverse employment action).  Region 20 disputes that Perez provided sufficient evidence of the third element, causation.  The district court found that Perez provided sufficient evidence of a causal connection.  It recognized that timing can constitute evidence of a causal connection between a protected activity and termination and looked to see whether Region 20 had articulated a legitimate, non-discriminatory reason for the termination.  The court then found that the reason proffered by Region 20, poor work performance, was adequate to shift the burden back to Perez to disprove the proffered reason.

We again assume that Perez made out his prima facie case. Perez's claim nonetheless fails because he has not provided

evidence to refute Region 20's proffered explanation for his discharge. Perez points to the failure by Region 20 to meet with him to set performance goals as evidence of pretext. Such a failure may be a management lapse, but it does not amount to evidence of retaliation. See Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1091 (5th Cir. 1995) ("The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive."). Perez also suggests that the fact that he received a low performance review within months of his complaint shows pretext. The negative August 1998 performance review, however, is substantiated by other evidence in the summary judgment record; Perez provides no evidence that challenges the accuracy of his performance review. Merely disagreeing with an employer's negative performance assessment is insufficient to show pretext. See Shackelford v. Deloitte & Touche, LLP, 190 F.3d 398, 408 (5th Cir. 1999). Perez has thus failed to produce sufficient evidence of pretext. The district court properly granted summary judgment on Perez's retaliation claim.

Perez also claims that Region 20 discharged him due to his Hispanic national origin. Again, even assuming that Perez could make out a prima facie case of discrimination, he simply provided insufficient evidence that his termination was due to anything other than his poor work performance. Poor work performance is a legitimate, non-discriminatory reason for discharge. See, e.g., Shackelford, 190 F.3d at 408. The district court properly granted summary judgment for Region 20 on this claim.

## C. Americans with Disabilities Act Claim

Perez next contends that he was discriminated against in violation of the ADA.  Before addressing the merits of this claim, we must address the jurisdictional issue of whether Perez's ADA claim is barred by sovereign immunity.[1]  We review Eleventh Amendment immunity determinations de novo.  See Cozzo v. Tangipahoa Parish Council, 279 F.3d 273, 280 (5th Cir. 2002).

The Eleventh Amendment bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity. See U.S. CONST. amend. XI; see also, e.g., Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 670 (1999) (finding an individual may sue a state if the state consents to suit or Congress validly abrogates sovereign immunity).  The state need not be the named party in a federal lawsuit, for a state's Eleventh Amendment immunity extends to any state agency or entity deemed an "alter ego" or "arm" of the state.  See Vogt v. Bd. of Comm'rs, 294 F.3d 684, 688-89 (5th Cir. 2002).

Region 20 and the amicus curie State of Texas argue that Region 20 is an arm of the state that has not consented to suit

---

[1]     Sovereign immunity does not bar Perez's Title VII claims, as we have long recognized that Congress has clearly abrogated the states' Eleventh Amendment immunity in enacting Title VII.  See, e.g., Ussery v. Louisiana ex rel. La. Dep't of Health & Hosps., 150 F.3d 431, 434-35 (5th Cir. 1998).

and Perez's claim under Title I of the ADA is thus barred.[2]  As the Supreme Court recently held in Board of Trustees v. Garrett, Congress did not abrogate the states' sovereign immunity in enacting Title I of the ADA.  See 531 U.S. 356, 365-74 (2001). Thus, the Eleventh Amendment bars Perez's ADA claim if Region 20 is considered an arm of the state.

The inquiry then becomes "whether the lawsuit is one which, despite the presence of a state agency as the nominal defendant, is effectively against the sovereign state."  Earles v. State Bd. of Certified Pub. Accountants, 139 F.3d 1033, 1037 (5th Cir. 1998).  This circuit uses a six-factor test to guide this inquiry.  Cozzo, 279 F.3d at 281-83; Clark v. Tarrant County, 798 F.2d 736, 744-45 (5th Cir. 1986).  The six factors are: (1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.  See Clark, 798 F.2d at 744-45.  No one factor is dispositive, though we have deemed the source of an entity's funding a particularly important factor because a principal goal of the Eleventh Amendment is to protect state

---

[2]     Perez argues in his brief that he was not afforded any opportunity to provide evidence that Region 20 is not an arm of the state because "the claim was raised for the first time in [Region 20's] reply."  Region 20 asserted its sovereign immunity defense in its First Amended Answer, directly in response to the ADA claim in Perez's First Amended Original Petition.  Perez has had sufficient notice of this defense.

treasuries.  See Hudson v. City of New Orleans, 174 F.3d 677, 682 (5th Cir. 1999).  An entity need not show that all of the factors are satisfied; the factors simply provide guidelines for courts to balance the equities and determine if the suit is really one against the state itself.  See id.

The district court concluded that Region 20 is an arm of the state entitled to Eleventh Amendment immunity.  The district court noted that the Texas Attorney General considers the Centers state agencies, that the Centers receive significant funding from the state, that the Commissioner of Education determines the number of Centers and their boundaries, and that the Commissioner directs the Centers in implementing legislative initiatives assigned to the Commissioner of Education.

Region 20 and the amicus curie State of Texas provide sufficient evidence that Region 20 is, in effect, an arm of the state.  The Education Service Centers are at the intermediate level of Texas's three-tiered educational system, between the state education agency and the local school districts.  San Antonio Indep. Sch. Dist. v. McKinney, 936 S.W.2d 279, 282 (Tex. 1996) ("At the state level, we have the Texas Education Agency, headed by the Commissioner of Education and the State Board of Education.  Regionally, the Legislature created Regional Education Service Centers.  At the local level are independent school districts.") (citations omitted).  The mission of the Centers is to "ensure that all Texas children have access to a quality education" because "a general diffusion of knowledge is essential for the welfare of this state and for the preservation

of the liberties and rights of citizens."  TEX. EDUC. CODE ANN. § 4.001(a) (Vernon 1996 & Supp. 2002).  The Centers provide several core services, such as teacher training and assistance to underperforming school districts, to improve educational efficiency and performance.  See id. § 8.051.  The Centers also administer statewide programs, such as technology initiatives, see id. § 32.001(a)(4), and programs for students with disabilities, see id. § 29.001(4).

*(1) State Statutes and Case Law*

First, we consider whether state statutes and case law view the Centers as arms of the state.  The Texas Education Code ("Code") reveals that the Centers are more closely aligned with state, rather than with local, government.  Chapter 7 of the Code establishes and defines the roles of the Texas Education Agency ("TEA"), see TEX. EDUC. CODE ANN. § 7.021 (Vernon 1996 & Supp. 2002), Commissioner of Education ("Commissioner"), see id. § 7.055, and State Board of Education, see id. § 7.102.[3]  Chapter 8 then explains that the Commissioner is responsible for establishing Centers for statewide access to educational resources and programs.  See id. § 8.001.  The Commissioner supervises the Centers and has broad authority to "decide any matter concerning the operation or administration of the regional education service centers."  Id. § 8.001(c).  A key purpose of the Centers is to "implement initiatives assigned by the legislature or the commissioner [of education]."  Id. § 8.002(3).

---

[3]    The Commissioner is appointed by the governor, see TEX. EDUC. CODE ANN. § 7.051 (Vernon 1996 & Supp. 2002), and is the executive officer of the TEA, see id. § 7.055(a)(2).

The Code distinguishes the Centers from local school districts, which are governed by Chapter 11 of the Code and are not under the guidance of the Commissioner and the TEA.  See, e.g., id. § 11.151(b) (explaining that school district trustees have the "exclusive power and duty" to govern public schools).  The Centers, then, are administrative subdivisions within the TEA according to state statutes.

Texas case law also suggests that the Centers are arms of the state.  In Davis v. Education Service Center, the Texarkana Court of Appeals considered whether a Center should be considered an arm of the state for purposes of state sovereign immunity. See 62 S.W.3d 890, 895-96 (Tex. App.--Texarkana 2001, no pet.). After a brief discussion, the court concluded: "When Davis sued Region VIII and Ferguson, in his official capacity, she sued the State of Texas."  Id. at 895.  While the analysis in Davis is not controlling on the issue of Eleventh Amendment immunity, it reflects the state's view that suing a Center is equivalent to suing the state of Texas itself.

State statutes and case law, then, indicate that the State of Texas views the Education Service Centers as arms of the state.[4]  Perez has not provided adequate summary judgment

---

[4]     While opinions of the state Attorney General are also relevant evidence of how a state views an entity, see, e.g., Clark, 798 F.2d at 744, Texas Attorney General opinions add little to our Eleventh Amendment inquiry.  The Texas Attorneys General have offered few opinions concerning the Centers, and their characterizations of the Centers have varied.  In one opinion, the Attorney General referred to Centers as "state agenc[ies]," Op. Tex. Att'y Gen. No. MW-61, at 3 (1979), but in another, the Attorney General stated that Center employees are "hired by and accountable to the local board of directors," not the state board, Op. Tex. Att'y Gen. No. JM-203, at 12 (1984).

evidence to rebut these authorities.[5]

*(2) Source of Funding*

Second, we address the extent to which the Centers receive funding from the State of Texas. This inquiry considers both the state's liability for a judgment rendered against the Centers and the state's liability for general debts and obligations. See Hudson, 174 F.3d at 687. While the Code does not contain a specific provision requiring the state to indemnify the Centers in the case of a judgment, the significant financial support the state affords to the Centers suggests that a judgment against a Center would be borne in large part by the state.

We examine the amount of funding the state provides to an entity and whether that funding is earmarked for any particular purposes to determine whether a judgment likely would be paid with state funds. See Hudson, 174 F.3d at 688-89. The State of Texas provides several types of funding to the Centers. Initially, Centers receive state funding to provide core services to school districts and campuses to improve student and school

_____

Neither of the opinions contained any other discussion of the role of the Centers.

[5] Perez suggests that Region 20 is not a state agency due to a statement made by the Commissioner of Education. After his discharge, Perez filed an administrative complaint with the Commissioner. In his complaint, Perez argued that the employment policies of the TEA applied to the Centers and that Region 20 violated the TEA policy against discrimination. The Commissioner found that the TEA policies did not apply to the Centers because the Centers were not "agents of TEA." The statement of the Commissioner was made in response to a specific question regarding interpretation of the Texas Education Code. The Commissioner did not address whether Eleventh Amendment immunity applies to the Centers. We find this evidence unhelpful in determining whether the Centers are properly considered alter egos of the state.

district performance and for basic operational expenses. See TEX. EDUC. CODE ANN. §§ 8.051, 8.121 (Vernon 1996 & Supp. 2002). For 2000-2001, the state appropriated $58.8 million per year to the Centers for "core services, technical assistance, and program support." Tex. H.B. 1, 76th Leg., R.S. (1999). For 2002-2003, the state allocated $61 million per year to the Centers. Tex. S.B. 1, 77th Leg., R.S. (2001). Further, the Centers may receive additional funding from the state, including funds for efficiency initiatives, see TEX. EDUC. CODE ANN. § 8.122 (Vernon 1996 & Supp. 2002), funding for specific state initiatives, see id. § 8.123, competitive grants for innovation, see id. § 8.124(a)(1), and emergency grants, see id. § 8.124(a)(2). The state Commissioner of Education has broad authority to distribute state funds and allocate federal funds to the Centers. See id. §§ 8.001(c)(3), 8.121(a), 8.122(c), 8.123(b)(2), 8.124(b)(2). The Centers also receive local funding through payment by school districts for certain services and grant contracts with public and private entities. See id. §§ 8.053, 8.125. This local funding, however, fluctuates based on the Centers' ability to generate revenues; state funding is the only assured source of funding for the Centers. Though the state is not the sole source of funding for the Centers, we are persuaded that state funding comprises the "lion's share" of the Centers' budgets. See Voqt, 294 F.3d at 693; see also Clark, 798 F.2d at 744 (finding that a county probation department was an arm of the state even though it generated revenue through probation fees).

Notably, unlike local school districts, the Centers do not

possess any tax levying or bonding authority that could be used to raise funds.  See TEX. EDUC. CODE ANN. § 11.152 (Vernon 1996 & Supp. 2002).  This fact counsels in favor of granting Region 20 immunity.  See Anderson v. Red River Waterway Comm'n, 231 F.3d 211, 214 (5th Cir. 2000) (finding no sovereign immunity because waterway commission could raise funds through its statutory taxing and bonding authority); Hander v. San Jacinto Junior Coll., 519 F.2d 273, 279 (5th Cir. 1975) (finding no immunity because state junior college could issue revenue bonds and levy annual ad valorem taxes).  In light of the Centers' dependence on the State of Texas for funding and their inability to raise their own revenues, it seems likely that a judgment rendered against the Centers would be paid in large portion by the state.  Indeed, the state provides the base funding for the Centers' operational expenses.  See TEX. EDUC. CODE ANN. § 8.121(c) (Vernon 1996 & Supp. 2002) ("Each regional education service center shall use money distributed to it under this section for the provision of core services . . . or for payment of necessary administrative and operational expenses of the center related to the provision of those services.").[6]

*(3) Local Autonomy*

Third, we ask whether the Centers exercise local autonomy or

---

[6]    Perez notes that the Centers are like school districts because Centers are subject to or exempt from taxation in the same way school districts are, see TEX. EDUC. CODE ANN. § 8.005 (Vernon 1996 & Supp. 2002), and because employees of Centers are immune from liability in the same way employees of school districts are, see id. § 8.006.  Neither of these factors, though, addresses whether a judgment against a Center would ultimately be paid by the state.

whether they are primarily controlled by the state. Frequent and broad oversight by the state suggests that the entity is an arm of the state. See Hudson, 174 F.3d at 689-90. In the case of the Centers, members of the Board of Directors of each Center are selected locally. See TEX. EDUC. CODE ANN. § 8.003(b) (Vernon 1996 & Supp. 2002). The Board of Directors governs each Center, develops management and operation policies, approves programs and activities, and establishes the budget. See id. § 8.003(e). Though the Directors are selected locally, their election is largely controlled by the state Commissioner of Education, as the Commissioner sets rules for selection, appointment, and continuity of board membership. See id. § 8.003(b). Once a Center's Board is elected, the Commissioner has the power to appoint a master or replace the Board of Directors if the Center is not performing well. See id. §§ 8.104(4), 8.104(5). Management of the Centers can be distinguished from management of local school districts, as local school districts determine their own procedures for electing their Boards of Trustees and Trustees have exclusive power over the school districts. See id. §§ 11.011, 11.051, 11.052.

More generally, the Centers are subject to significant supervision by the state Commissioner of Education. The Commissioner has broad authority to "decide any matter concerning the operation or administration" of the Centers. See TEX. EDUC. CODE ANN. § 8.001(c) (Vernon 1996 & Supp. 2002). The Commissioner sets operation and performance standards for each Center, see id. § 8.101, and Centers are required by law to report their

performance to the Commissioner annually, see id. §§ 8.103, 39.054(3)(B). Underperforming Centers may be sanctioned or even closed by the Commissioner. See id. § 8.014. Further, the Commissioner must approve the appointment of each Center's Executive Director and can remove an Executive Director if a Center is underperforming. See id. §§ 8.004, 8.104(5).

The state oversight and control of the Centers contrasts markedly with the significant autonomy of local school districts. "Under Texas law, independent school districts enjoy a large amount of political autonomy from the State, the TEA, and the [State] Board [of Education]." McKinney, 936 S.W.2d at 282. Each school district is governed by a Board of Trustees elected by the voters of the district. See TEX. EDUC. CODE ANN. §§ 11.051-.053 (Vernon 1996 & Supp. 2002). Trustees have "the exclusive power and duty to govern . . . public schools of the district." Id. § 11.151(b). "Importantly, neither the TEA nor the Board may substitute its judgment for the lawful exercise by district trustees of their powers and duties." McKinney, 936 S.W.2d at 282-83. The Centers' relative lack of autonomy counsels in favor of Eleventh Amendment protection.

*(4) Local or Statewide Issues*

Fourth, we consider whether the Centers focus primarily on local or statewide issues. This factor asks "whether the entity acts for the benefit and welfare of the state as a whole or for the special advantage of local inhabitants." Pendergrass v. Greater New Orleans Expressway Comm'n, 144 F.3d 342, 347 (5th Cir. 1998). A primary mission of the Centers is to ensure

statewide uniformity and quality in education. See TEX. EDUC. CODE ANN. § 4.001(a) (Vernon 1996 & Supp. 2002). The Texas Legislature gave the Commissioner power to establish up to twenty Centers and delineate their boundaries to serve schools around the state. See id. § 8.001. The Centers are accountable to the state Commissioner of Education, see, e.g., id. §§ 8.101, 8.103, not to local voters. The Centers collect and deliver educational resources throughout the state, not just in one area; the Centers are simply divided into regions for convenience. See id. § 8.001(b). Though "[l]imited territorial boundaries suggest that an agency is not an arm of the state," an exception applies when a "regional entity is an administrative division of a statewide system." Vogt, 294 F.3d at 695; see also Clark, 798 F.2d at 745 ("Dividing the responsibilities [of the state probation system] into judicial districts is merely an administrative tool for handling a statewide, state program."). The Centers are just such an entity, as they serve as administrative divisions of the unitary state educational system.

*(5) Ability To Sue and Be Sued*

Fifth, we consider whether the Centers can sue or be sued in their own names. The ability for an entity to sue and be sued apart from the state suggests that immunity is not appropriate. See Williams v. Dallas Area Rapid Transit, 242 F.3d 315, 322 (5th Cir.), cert. denied, 122 S. Ct. 618 (2001). The Code does not grant the Centers any statutory authority to sue, but it also does not prevent a Center from being sued in its own name. In contrast, the Code expressly provides that school districts may

sue and be sued.  See TEX. EDUC. CODE ANN. § 11.151(a) (Vernon 1996 & Supp. 2002).  This factor, then, slightly favors immunity for the Centers.

*(6) Ability To Hold and Use Property*

Finally, we consider whether the Centers may hold and use property.  According to Texas law, the Centers may hold property, but this right is subject to approval by the Commissioner.  The Centers are authorized by statute to purchase, lease, and acquire property.  See TEX. EDUC. CODE ANN. § 8.055(a) (Vernon 1996 & Supp. 2002).  Any transaction involving real property, however, must be approved by the Commissioner.  See id. § 8.055(b).  Further, the legislature has prohibited the Centers from purchasing land or acquiring buildings without prior authorization by the Commissioner.  See Tex. S.B. 1, 77th Leg., R.S. (2001) (Rider 4); Tex. H.B. 1, 76th Leg., R.S. (1999) (Rider 4).  In contrast, local school districts are expressly authorized to "acquire and hold real and personal property."  TEX. EDUC. CODE. ANN. § 11.151(a) (Vernon 1996 & Supp. 2002).  This factor, then, weighs slightly in favor of immunity.

Each of the six factors counsels in favor of immunity, some more strongly than others.  Combined, these factors make it clear that Region 20, as one of Texas's Education Service Centers, is properly considered an arm of the State of Texas and thus enjoys Eleventh Amendment immunity from suit in federal court.

Perez contends that even if Region 20 is an arm of the state, it waived its sovereign immunity by removing this case to federal district court.  In support of this proposition, he cites

Lapides v. Board of Regents, where the Supreme Court recently held that a state entity removing a case to federal district court waives its sovereign immunity with respect to state law claims. See 122 S. Ct. 1640, 1643-46 (2002). Subsequent to the point at which we asked for supplemental briefing to assess the impact of Lapides, our court decided Martinez v. Texas Department of Criminal Justice. See No. 00-51135, 2002 WL 1721803 (5th Cir. July 25, 2002).

Martinez considered whether a plaintiff's argument of removal-by-waiver based on Lapides should be considered for the first time on appeal. See 2002 WL 1721803, at *6-7. Martinez alleged violations of the First Amendment and the Texas Whistleblower Act. See id. at *5. The district court denied Eleventh Amendment immunity to the defendants, and the defendants appealed. See id. Martinez argued for the first time on appeal that the defendants' removal to federal court waived their Eleventh Amendment immunity, citing Lapides. See id. at *6. We noted "our long established course of refusing, absent extraordinary circumstances, to entertain legal issues raised for the first time on appeal" and found that no extraordinary circumstances existed because the law "was not so settled prior to Lapides that raising [the] waiver-by-removal claim in district court would have been pointless or futile." Id. at *7. We thus declined to consider the plaintiff's waiver-by-removal argument for the first time on appeal. See id.

The present case is factually on all fours with Martinez. In this case, Perez raised the removal-by-waiver argument for the

first time on appeal.  As in Martinez, the relevant inquiry is whether extraordinary circumstances exist to justify Perez's failure to raise the waiver argument in the district court.  We find no extraordinary circumstances in this case justifying Perez's failure to raise the argument and thus we do not consider whether Lapides means Region 20 waived its sovereign immunity.  See Martinez, 2002 WL 1721803, at *7.  Put another way, Perez's claim that Region 20 waived its sovereign immunity has itself been waived.

Perez also argues that Texas law waives Region 20's sovereign immunity.  Perez cites a provision of the Texas Labor Code which waives sovereign immunity for claims brought under the Texas Commission on Human Rights Act.  See TEX. LAB. CODE ANN. §§ 21.002(8)(D), 21.002(14)(A) (Vernon 1996 & Supp. 2002).  Perez contends that since a purpose of the Texas Labor Code is to "provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 and its subsequent amendments," id. § 21.001(3), the Texas Labor Code's waiver of sovereign immunity for Texas Labor Code claims in state court waives sovereign immunity on federal ADA claims in federal court.

It has long been settled that a state's waiver of its Eleventh Amendment immunity must be unequivocally expressed.  See, e.g., Edelman v. Jordan, 415 U.S. 651, 673 (1974); Magnolia Venture Capital Corp. v. Prudential Sec., Inc., 151 F.3d 439, 443-44 (5th Cir. 1998).  A state's waiver of sovereign immunity in state court does not mean the state has waived Eleventh Amendment immunity in federal court.  See Martinez, 2002 WL

1721803, at *7 (citing cases).  The section of the Texas Labor Code Perez cites does waive sovereign immunity for claims brought under the Labor Code in state court.  See Sauls v. Montgomery County, 18 S.W.3d 310, 313-15 (Tex. App.--Beaumont 2000, no pet.).  The Texas Labor Code, however, does not contain a clear and unequivocal waiver of immunity from suit with respect to the ADA, a distinct federal statute.  Further, the cited section does not expressly waive sovereign immunity in <u>federal</u> court.  Thus, Perez's contention that the Texas Labor Code waives Region 20's immunity in this case is meritless.

The district court properly concluded that Eleventh Amendment immunity bars Perez's ADA claim.  Thus, we need not reach the merits of this claim.[7]

## D.  Texas Whistleblower Act Claim

Perez's final claim is that Region 20 retaliated against him for reporting another employee's sexual harassment in violation of the Texas Whistleblower Act.  The Texas Whistleblower Act prevents a government employer from taking an adverse employment action against an employee who, in good faith, reports his employer's violation of law to an appropriate law enforcement

---

[7]  Perez contends that even if sovereign immunity applies to Region 20, it bars only his claim for money damages under the ADA, not his claim for injunctive relief.  This argument misunderstands the nature of suits against states permitted in federal court under the Eleventh Amendment.

Suits against <u>state officials</u> for prospective injunctive relief may be permitted in federal court.  See <u>Garrett</u>, 531 U.S. at 374 n.9; <u>Ex Parte Young</u>, 209 U.S. 123, 155-56 (1908); <u>see also</u> <u>Edelman</u>, 415 U.S. at 664-65 (distinguishing between prospective and retroactive injunctive relief).  Perez, however, has sued only Region 20 itself and not any of its officers.  Thus, Perez's argument that sovereign immunity does not bar injunctive relief in his case fails.

agency.  TEX. GOV'T CODE ANN. § 554.002 (Vernon 1994 & Supp. 2002).

The district court found that Perez's Whistleblower Act claim failed on the merits.  We need not address the merits of the Texas Whistleblower Act claim because this claim is barred by Eleventh Amendment immunity as well.[8]  The Texas Whistleblower Act waives sovereign immunity in state court.  See TEX. GOV'T CODE ANN. § 554.0035 (Vernon 1994 & Supp. 2002) ("Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter.").  We recently held, however, that the Texas Whistleblower Act's waiver of sovereign immunity in Texas state court does not amount to a waiver of its sovereign immunity in federal court.  See Martinez, 2002 WL 1721803, at *7-8.  We noted that "[e]ven when a State consents to suit in its own courts, . . . it may retain Eleventh Amendment immunity from suit in federal court."  Id. at *7.  We then examined the text of the waiver provision in the Whistleblower Act and concluded that the Act does not "evidence[] any intent by Texas to waive its Eleventh Amendment immunity and subject itself to suit in federal courts."  Id.  Since we hold that Region 20 is an arm of the State of Texas, sovereign immunity bars Perez's claim under the Whistleblower Act.  We affirm summary judgment on this claim, though on different grounds that those cited by the district court.

## IV.  CONCLUSION

---

[8]    Although Region 20 did not argue that sovereign immunity bars the Texas Whistleblower Act claim, we may consider this issue sua sponte because it bears on this court's subject-matter jurisdiction.  See Burge v. Parish of St. Tammany, 187 F.3d 452, 465-66 (5th Cir. 1999).

The judgment of the district court is AFFIRMED.  All outstanding motions are DENIED as moot.