911 So.2d 333 (2005)
Daryl BERRY, et al., Plaintiffs-Appellees
v.
CITY OF BOSSIER CITY, et al., Defendants-Appellants.
No. 40,063-CA.
Court of Appeal of Louisiana, Second Circuit.
September 8, 2005.
*336 Cook, Yancey, King & Galloway, by Kenneth Mascagni, S. Price Barker, J. Jarrod Thrash, Shreveport, for Defendant-Appellant City of Bossier City, Defendants-Appellees Fire Chief Donnie Faith, Police Chief Mike Halphen, City of Bossier City and City Attorney James Hall.
English & Associates, L.L.C., by Larry English, Shreveport, for Plaintiffs-Appellees.
Darien D. Lester, Michael Nerren, Bossier City, for Defendant-Appellee David Shanks.
Before BROWN, GASKINS and PEATROSS, JJ.
GASKINS, J.
This appeal arises from a lawsuit by African-American firefighters alleging racial discrimination within the Bossier City Fire Department (BCFD). The City of Bossier City appeals from the trial court's failure to grant summary judgment dismissing all of the claims of two of the firefighters, Jimmie McGee and Cameron Lacoure, on the basis that their deposition testimony established that there had been no discrimination against them. We reverse.

FACTS
On January 25, 2002, 23 African-American firefighters and 15 of their spouses filed suit pursuant to Title VII of the Civil Rights Act of 1964 and La. C.C. arts. 2315 to 2324. Named as defendants were the City of Bossier City, Fire Chief Donnie Faith, City Attorney James Hall, Police Chief Mike Halphen and Investigator David Shanks. The petition alleged numerous types of racial discrimination within the BCFD, including discriminatory hiring practices, creation of a racially hostile work environment, and discriminatory disciplinary practices. They also alleged retaliation. According to the petition, Chief Faith failed to implement promised reforms. The plaintiffs also contended that an investigation conducted into the matter by Shanks was a "sham"; they alleged *337 that Shanks was hired by the city attorney on the recommendation of the police chief, who promised Shanks investigative work on behalf of Bossier City in exchange for a report favorable to the BCFD.
In their answer filed on February 14, 2002, the City, Faith, Hall and Halphen generally denied the allegations. Among other things, they also asserted prescription, qualified immunity, discretionary action of a public entity and official, and failure of the plaintiffs to exhaust their administrative remedies. Shanks filed a general denial.
On March 5, 2004, the defendants filed a motion for summary judgment seeking dismissal of the claims of plaintiff Jimmie McGee. The defendants asserted that McGee admitted in his deposition that he had no facts to support the claims in the lawsuit and that he did not believe that he had been discriminated against in hiring, training, seniority, promotions or discipline. Nor did he believe that he had been subjected to a racially discriminatory work environment or ever been retaliated against. He also had no complaints about the Internal Affairs investigation.
On March 8, 2004, the defendants filed a similar motion for summary judgment as to the claims of Cameron Lacoure and his wife Unique Lacoure.
The plaintiffs filed oppositions to the motions for summary judgment. In addition to memorandums opposing the motions, the plaintiffs filed lists of exhibits to be considered which included the affidavits of McGee and Lacoure. In his affidavit, McGee stated that, after reviewing information used to certify him, he now believed he had facts showing that he was unfairly certified based on his race. He said that while performing the agility test he was told by the white training staff to take his time and not make mistakes which would eliminate him from passing the test. He later learned that the agility test was a factor in the certification process. Also, his class was given a second agility test upon which he received the slowest score. He received the second highest rating on the EMT test but learned later that it did not count toward certification. In his affidavit, Lacoure stated that since reviewing information provided by the defendants, he now believed that he had facts showing that he was unfairly certified based on his race. While told that he had to take the civil service exam to be hired, Lacoure stated that he was never told his score would be counted toward his certification ranking. He said that had he known this, he would have taken the test more than once. Like McGee, he said that while performing the agility test he was told by the white training staff to take his time and not make mistakes which would eliminate him from passing the test.
A hearing was held on October 7, 2004. The defendants presented excerpts from McGee's and Lacoure's depositions. As to Lacoure, the defendants asserted that the only issues not affirmatively negated by Lacoure's deposition testimony were hostile work environment and certification discrimination. (Counsel for the plaintiffs made no objection as to summary judgment for Lacoure as to hiring, training, promotion, discipline and retaliation.) According to the defendants, the grounds of Lacoure's claim of a hostile work environment were a Tiger Woods joke and a comment about O.J. Simpson. Lacoure also contended that he and a white firefighter had exchanged banter wherein each called the other racial names. The defendants argued that these incidents were not indicative of a "severe and pervasive" hostile workplace and that Lacoure conceded in his deposition that it did not affect his work. As to certification, Lacoure was unable to give any basis in his deposition *338 for suggesting that certification was based on race. In his subsequent affidavit, he asserted that he would have done better on his certification had he been informed that the agility test times and the civil service exam scores would be used for certification. However, affidavits submitted by the defendants from the training officer and the chief stated that everyone was told the exact same thing about the test. The defendants also contend that the person who performed best on the agility test was another black firefighter who is also a plaintiff in the instant suit. In contravention, Lacoure stated in his affidavit that he was told to slow down by the white firefighters administering the test and that he was not told that the agility test would count toward his certification.
Finding that the language complained of between Lacoure and the white firefighter might be considered "severe and pervasive" depending upon the particular circumstances surrounding their utterances, the court denied summary judgment on the hostile workplace issue. Likewise, the court declined to grant summary judgment on the certification issue, finding that the allegations were such as to allow Lacoure his day in court. The trial court granted summary judgment as to Lacoure in favor of Faith, Hall, Halphen and Shanks as individuals. It also granted summary judgment dismissing Mrs. Lacoure's claims.
As to McGee, the trial court granted summary judgment in favor of Faith, Hall, Halphen and Shanks as individuals. On the issue of certification, the same arguments were presented on McGee's behalf as had been for Lacoure. As to promotion, McGee alleged that he was not given a chance to "drive out of class," or to be moved up in class to the status of driver for a shift when a replacement driver was unavailable, even though he had seniority over other firefighters who were allowed to do so. He alleged retaliation in that, after allegations of discrimination surfaced in the media, he was required to do extra unscheduled cleaning and chores. The defendants argued that the scheduling on the driving issue is "merely fortuitous" and did not involve discrimination. They also cited McGee's deposition testimony that he did not feel that he had been retaliated against personally and that he had no facts to suggest "any type of race-based retaliation" against him. McGee contended that his affidavit and answers to interrogatorieswhich set forth different responses than his depositionprovided a basis for his opposition to the motion for summary judgment. While the trial court granted summary judgment against McGee on the issues of hiring, training, discipline and hostile work environment, it denied it as to promotion, retaliation and certification.
Judgment in conformity with these rulings was signed on November 5, 2004.

ARGUMENT
As the only remaining defendant, the City appeals. It argues that its motions for summary judgment were supported by deposition testimony and that McGee and Lacoure opposed the motions based upon only affidavits and unsworn and unverified answers to interrogatories. The City maintains that the plaintiffs' response to the motions was untimely. Additionally, some of the information in the affidavits was speculative, i.e., had he known the importance of the agility test, Lacoure would have performed better. It also argues that the trial court erred in applying a "scintilla of evidence" standard in denying a motion for summary judgment.
The City further asserts that the plaintiffs failed to make a prima facie case on each of the legal claims. As to the claim of retaliation, McGee did not show that the *339 BCFD took an "adverse employment action"; to the contrary, he stated in his deposition that he had not been retaliated against personally. On the claim of failure to promote, the City states that McGee's "drive out of class" allegation does not involve a promotion, but a temporary substitution for an absent driver. As to certification, McGee testified in his deposition that he thought he got certified when he should have. In his affidavit, he asserted that white training officers essentially sabotaged him by telling him to slow down. As to Lacoure's claims, the City argues that he failed to show that the alleged racial statements were frequent or severe enough to rise to the level of a hostile work environment as established by the jurisprudence or that they interfered with his job performance. The City also contends that Lacoure's certification complaints are based purely on the assumption that, had he known of the promotion criteria, hebut not others being tested would have performed better and received a higher score.
In their brief, the plaintiffs argue that they made a prima facie case in showing that the BCFD certification process was discriminatory because it has a disparate impact on African-American candidates and the BCFD did not have a nondiscriminatory reason for parts of its certification process. They argue that a genuine issue of material fact existed as to whether the agility test is valid and thus summary judgment is precluded. On the matter of hostile work environment and retaliation, appellate counsel deferred to the arguments made at the hearing by the plaintiffs' trial counsel. However, appellate counsel asserted that the determination of the existence of and pervasiveness of the alleged hostile work environment was a question of fact not suitable for summary judgment.

SUMMARY JUDGMENT
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. NAB Natural Resources, L.L.C. v. Willamette Industries, Inc., 28,555 (La.App. 2d Cir.8/21/96), 679 So.2d 477.
Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966. The burden of proof remains with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the motion for summary judgment, the movant's burden on the motion does not require him to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. La. C.C.P. art. 966(C)(2).
Despite the legislative mandate that summary judgments are now favored, factual inferences reasonably drawn from the evidence must be construed in favor of the party opposing the motion and all doubt must be resolved in the opponent's favor. Row v. Pierremont Plaza, L.L.C., 35,796 (La.App. 2d Cir.4/3/02), 814 So.2d 124, writ denied, XXXX-XXXX (La.8/30/02), 823 So.2d 952.
The nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony. Copeland v. Wasserstein, Perella & Co., Inc., 278 F.3d 472 (5th Cir.2002).
*340 The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. Row v. Pierremont Plaza, L.L.C., supra; Birdsong v. Hirsch Memorial Coliseum, 39,101 (La.App. 2d Cir.12/15/04), 889 So.2d 1232; Jones v. Webb, 36,121 (La.App. 2d Cir.6/12/02), 821 So.2d 614, writ denied, XXXX-XXXX (La.10/14/02), 827 So.2d 425.

McGEE'S CLAIMS

Deposition testimony
When questioned about retaliation during his September 2002 deposition, McGee gave the following testimony:
Q. Do you have any facts to suggest there's any type of retaliation by the Bossier City Fire Department on any race-based basis, or racial basis?
A. I don't feel like I've been retaliated against, personally.
. . .
Q. You have no facts to suggest any type of race-based retaliation against you; is that correct?
A. That's correct.
Q. Do you have any facts to suggest any race-based retaliation against anyone?
A. Facts, no, I don't.
As to the issue of failure to promote, McGee testified in his deposition:
Q. With regard to  I may have asked this, promotions, have you been denied any promotion by reason of race?
A. No.
On the issue of certification, McGee gave the following testimony in his deposition:
Q. Is there any fact to suggest that there was any discrimination by the Bossier City Fire Department with regard to certification of you?
A. No, I think I got certified where I should have got certified.
. . . .
Q. Okay. If there was any race-based discrimination, if there was, which is being denied by the Bossier City Fire Department, then it had no impact on you with regard to certification, correct?
A. Yes, that's true.
. . . .
Q. Do you have any facts to suggest any race-based discrimination with regard to certification?
A. All I know is, you look on that seniority list and you see them classes, you see them blacks tend to finish toward the end. Now, why that is, I don't know.
I guess the answer would be, no, I guess. Yeah, the answer would be no.
. . . .
Q. Do you have any facts to suggest there's any race-based discrimination by the Bossier City Fire Department with regard to seniority promotion?
A. No, because once you get locked into the seniority system, it's a good system, I like that system.

Affidavit
In a September 2004 affidavit, McGee stated that, after reviewing the evidence used to certify him, he now believed that he had facts supporting his contention that he was unfairly certified based on his race. He said that he intentionally performed the agility test slower than his ability due to "incomplete and apparent misleading advice" by BCFD's "all White" staff of training officers, who suggested that he *341 take his time to avoid mistakes that would eliminate him from passing the test but to still finish within the time limit. He was told that the test was pass or fail and that he only had to pass to be considered for the next class. He stated he was never told that the agility test times were a factor considered toward his certification.
McGee also said in his affidavit that his class was given a second agility test which no other class was ever required to do. He was not told the scores of this test were going to count toward certification. He had the slowest score on his second agility test and it adversely affected his class certification.
When his class took EMT exams, he made the second highest score; however, he was later told these scores did not count toward the class' certification.

LACOURE'S CLAIMS

Deposition testimony
On the issue of hostile work environment, Lacoure made the following responses in his September 2002 deposition:
Q. Do you ever believe there was a racial slur directed at you by a member of the Bossier City Fire Department?
A. Yeah.
Q. When?
A. Times like at number four, when John and myself, John Woodfin, have said something to each other.
Q. What was said when?
A. He call me a black skinhead, you know, black MF, this or that, you know.
Q. Have you ever called him similar names?
A. Yes.
Q. You just switch the word from black to white?
A. Probably.
Q. He calls you a black skinhead, you call him a white skinhead?
A. That's right.
Q. If he calls you a black MF, you call him a white MF?
A. That's right.
Q. If he calls you a black this-and-that you called him a white this-and-that?
A. Right.
. . . .
Q. Wherever the places you were working together you were friends with Mr. Woodfin?
A. Yeah.
. . . .
Q. Give me any time that you believe Mr. Woodfin was making a racial slur against you, specific occasions. . . .
A. There was a time at number eight that Sheldon Jones said that [Woodfin]. . . referred to me with the N-word.
. . . .
Q. Give me any other occasion . . .
A. We was just discussing, you know, that [O.J. Simpson's] wife was dead, it was a white woman and you know, O.J. was black, he was going to get off, he had money, different stuff like that.
. . . .
Q. Is there any other race-based discrimination that you know about that you haven't already told me about here in this deposition?
A. Oh, well, it's just like the time at number five when, you know, Captain Digilormo made a statement or was making, quote, unquote, the joke about Tiger Woods. . . .
Q. What did Captain Digilormo say?
A. What do you call 100 men chasing a black man? . . . Well, then he told the punch line, the PGA.
On the issue of racial discrimination as to certification, Lacoure testified:

*342 Q. Do you have any facts to suggest that the certification of any firefighter was based on his race?
A. Do I now?
Q. Yes.
A. I don't have anything with me now.

Affidavit
In a September 2005 affidavit, Lacoure stated that after reviewing information provided by the defendants, he now believed that he had facts showing that he was unfairly certified based on his race. He said that he was never told that the civil service exam he had to take to be hired would also be counted toward his certification ranking. He stated that, had he been aware of this, he would have taken the test more than once to try to get a higher score to increase his chances of a higher certification ranking. His statements pertaining to the agility test are virtually identical to those made by McGee.

RETALIATION
In order to establish a prima facie claim of Title VII retaliation, an employee must show: (1) that the employee engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action. Hernandez v. Crawford Building Material Company, 321 F.3d 528 (5th Cir.2003), cert. denied, 540 U.S. 817, 124 S.Ct. 82, 157 L.Ed.2d 34 (2003); Ackel v. National Communications, Inc., 339 F.3d 376 (5th Cir.2003); Roberson v. Alltel Information Services, 373 F.3d 647 (5th Cir.2004). As to the requirement of an adverse employment action, in the Fifth Circuit, only an "ultimate employment decision" by an employer can form the basis for liability for retaliation under Title VII. Hernandez, supra. "Ultimate employment decisions" include acts such as hiring, granting leave, discharging, promoting, and compensating. Mattern v. Eastman Kodak Company, 104 F.3d 702 (5th Cir.1997), cert. denied, 522 U.S. 932, 118 S.Ct. 336, 139 L.Ed.2d 260 (1997). Title VII does not address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions. Ackel, supra.
In his September 2002 deposition, McGee stated that he did not feel there had been retaliation against him personally. Furthermore, McGee's claims of retaliation involved being required to perform extra unscheduled cleaning and chores after allegations of discrimination surfaced in the media. These acts do not fall into the category of "ultimate employment decision."
Summary judgment on the issue of McGee's claims of retaliation is appropriate and hereby granted.

FAILURE TO PROMOTE
An employee presents a prima facie case of discrimination in a failure to promote case by demonstrating four elements: (1) that the employee is a member of the protected class; (2) that he sought and was qualified for the position; (3) that he was rejected for the position; and (4) that the employer continued to seek or promoted applicants with the plaintiff's qualifications. Davis v. Dallas Area Rapid Transit, 383 F.3d 309 (5th Cir. 2004). If a plaintiff establishes a prima facie case of discrimination based on failure to promote under Title VII, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's rejection. Perez v. Region 20 Educ. Service Center, 307 F.3d 318 (5th Cir.2002). If the employer articulates a nondiscriminatory reason for its failure to promote the plaintiff, then the plaintiff *343 must show that the employer did intentionally discriminate, which the plaintiff may do by demonstrating that the employer's proffered reason is simply a pretext for discrimination. Perez, supra.
McGee's failure to promote claim arises from his contention that he was not given a chance to "drive out of class," or to be moved up in class to the status of driver for a shift when no replacement driver was available, even though he had seniority over other firefighters who were allowed to "drive out of class." In an affidavit, Chief Faith stated that, due to absences for such reasons as sickness or vacations, firefighters may "drive out of class" on a shift even though they have a lower date of certification than other firefighters on another shift. He states that this is the "product of imperfect scheduling," not race-based discrimination.
We note that McGee's complaint does not appear to deal with an actual promotion, but with a temporary scheduling reassignment due to absences. Since "driving out of class" was only temporary and not a promotional opportunity, it does not constitute an ultimate employment decision under Title VII, and summary judgment in the employer's favor is appropriate. See Johnson v. Louisiana ex rel. Louisiana Board of Supervisors for Louisiana State University Agricultural and Mechanical College, 79 Fed.Appx. 684, 2003 WL 22478180 (5th Cir.2003).

HOSTILE WORK ENVIRONMENT
A hostile environment is one that does not affect an employee's economic benefits, but instead creates a hostile or offensive working environment. In order to prevail in a hostile work environment claim, plaintiffs must assert and prove: (1) they belong to a protected group; (2) they were subjected to harassment; (3) the harassment was motivated by discriminatory animus (race); (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action. Hicks v. Central Louisiana Electric Company, Inc., XXXX-XXXX (La.App. 1st Cir.5/15/98), 712 So.2d 656; King v. Phelps Dunbar, L.L.P., XXXX-XXXX (La.App. 4th Cir.4/2/03), 844 So.2d 1012, writ denied, XXXX-XXXX (La.11/21/03), 860 So.2d 541.
For racist comments, slurs, and jokes to constitute a hostile environment, there must be more than a few isolated incidents of racial enmity. Hicks v. Central Louisiana Electric Company, Inc., supra. See also Powell v. Missouri State Highway and Transportation Department, 822 F.2d 798 (8th Cir.1987), wherein a maintenance crew member was subjected to isolated instances of racially derogatory language; however, he also participated in what was described as "racial joking" himself. To constitute actionable harassment, the conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Bolden v. PRC Inc., 43 F.3d 545 (10th Cir.1994), cert. denied, 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995). Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments. Bolden, supra.
The evidence in the record before us does not support the inference of pervasive racial harassment as to Lacoure. Instead it demonstrated isolated incidents of racial comments, slurs and jokes. Some of the racial comments described by Lacoure in his deposition appear to be banter in which he participated with a white firefighter whom he described as a friend. Consequently, summary judgment in the defendant's favor is appropriate on the issue of hostile work environment.

*344 CERTIFICATION
To establish a prima facie case of discrimination under Title VII, a plaintiff may prove his claim either through direct evidence, statistical proof, or the test established by the U.S. Supreme Court in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Brittain v. Family Care Services, Inc., 34,787 (La.App. 2d Cir.6/20/01), 801 So.2d 457. First, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. Under the circumstantial evidence test of McDonnell Douglas, supra, a plaintiff is first required to establish a prima facie case by showing that he: (1) is a member of a protected class; (2) was qualified for the position; (3) was terminated; and (4) was replaced by someone outside the protected class. Seagrave v. Dean, 2003-2272 (La.App. 1st Cir.6/10/05), 908 So.2d 41. Second, assuming the plaintiff demonstrates a prima facie case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and nondiscriminatory reason for discharging the employee. Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. And in attempting to satisfy this burden, the plaintiff, once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision, must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Brittain v. Family Care Services, Inc., supra.
According to an affidavit filed by Chief Faith, after finishing his training at the academy, a firefighter works for a year on a probationary basis. Upon satisfactory completion of this period, the firefighter is "certified" as a permanent firefighter. His certification date determines his rank in his class. To qualify for seniority promotion, firefighters must pass a test; of those who qualify, the position is awarded to the one with the highest rank, i.e., the earliest certification date.
In their depositions, neither McGee nor Lacoure was able to provide any facts supporting the claim of racial discrimination in certification. In fact, McGee testified that he believed he "got certified where I should have got certified." In their subsequent affidavits, each of these two plaintiffs asserted that, due to information that had been brought forward during discovery, he now believed that he had "facts which support his contention that he was unfairly certified based on race." Both stated that they were not told that the agility test times were considered in certification. Each stated in his affidavit that the white training officers told him the test was pass or fail and that he only had to pass to be considered for the next class. According to both of their affidavits, these training officers also suggested taking their time to avoid mistakes eliminating them from passing the test; however, the training officers told them to finish within the time limit. The affidavits do not state that the training officers gave these admonishments only to the black recruits.
Chief Faith submitted an affidavit dated September 30, 2004, in which he stated that, as a training officer who administered agility tests in the mid 1990s, he and the other training officers gave every recruit the same information. The recruits were told that the agility test was pass/fail, that it was necessary to pass the test to even be considered by the BCFD, and that they *345 should be careful as failure on this exam would eliminate them from employment consideration with the BCFD. Chief Faith further stated that none of the recruits were ever told that the agility test times would be used for certification.
Affidavits from J.T. Wallace, Jr., the BCFD chief from 1992 to 1999, were also submitted. He stated that Lacoure was a member of the April 6, 1994 class, that he finished 12 out of 14 recruits, and that he was thus certified 12th. According to Chief Wallace, the class was certified based on the recruits' performance on the Civil Service Exam, the agility test, the class test average, and the EMT test average. He stated that McGee was a member of the April 26, 1995 class and he was certified last in his class due to his performance in training. This class was certified based on the agility test, the class test average, the Fire Fighter 1 test score, the Fire Fighter 2 exam score, a second agility test, the LSU Fire Fighter 1 test and the LSU Fire Fighter 2 test. At that time, EMT test scores were not considered because the recruits completed that training before coming to the BCFD.[1] Since Chief Wallace decided to not use the Civil Service test (which was taken well before BCFD training began) and in the absence of the EMT test scores, he added the additional exam scores and the additional agility test; he felt that an increased number of objective criteria would be the best indication of the recruits' performance. According to Chief Wallace, the Civil Service score would not have affected McGee's certification because he did not pass the LSU Fire Fighter 1 exam on the first try and he did not pass the LSU Fire Fighter 2 exam. Chief Wallace stated that race was not a factor in the certification of any class.
The evidence submitted on summary judgment does not support McGee's and Lacoure's assertions that they were the victims of racial discrimination by the BCFD. The advice given to them about being careful during the agility test to avoid a mistake that would be disqualifying was given to all recruits, regardless of race. Furthermore, it was apparently sound advice as to this pass-or-fail test. McGee and Lacoure also assert that they were not told about the factors that were considered in certification ranking. However, there is no evidence that other recruits of other races were given this information. To the contrary, the evidence indicates that none of the recruits were told about the factors so that they would put forth their best efforts on all aspects of training, not just the ones used for certification. Lacoure stated in his affidavit that, had he known that the civil service exam scores would count towards his certification ranking, he would have taken the exam more than once to try to get a better score. Likewise, it is implied in both his and McGee's affidavits that, had they known of the factors used in determining certification ranking, they would have tried harder and done better. However, this is speculation on their part. Mere speculation is not sufficient. Ray v. City of Bossier City, 37,708 (La.App. 2d Cir.10/24/03), 859 So.2d 264, writs denied, *346 XXXX-XXXX & XXXX-XXXX (La.2/13/04), 867 So.2d 697
We find that summary judgment on the issue of certification is appropriate and is hereby granted as to McGee and Lacoure.

CONCLUSION
The judgment of the trial court denying summary judgment is reversed. We grant summary judgment in favor of the defendant and against Jimmie McGee on the issues of retaliation, failure to promote and certification. We also grant summary judgment in favor of the defendant and against Cameron Lacoure on the issues of hostile work environment and certification.
Costs of this appeal are assessed against the plaintiffs.
REVERSED.
NOTES
[1] In a second affidavit, Chief Wallace stated that in the mid-1990s, the BCFD established the completion of an EMT test as a prerequisite to hiring of new cadets. Thereafter, the recruits independently obtained EMT training before their hire. According to Chief Wallace, the BCFD only used EMT test scores for certification when the BCFD actually performed the EMT instruction; the BCFD did not want to use the effectiveness of independent instruction as the basis for certification. When he was chief, the BCFD did not inform recruits of the criteria for certification because they wanted them to perform their best on all aspects of training, not just the ones considered in certification.