**GULF REGIONAL EDUCATION TELEVISION AFFILIATES,**
Appellant,

v.

**UNIVERSITY OF HOUSTON and Florence M. Monroe, Appellees.**

No. B14–86–875–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 21, 1988.

Rehearing Denied March 17, 1988.

Jay S. Siskind, Houston, for appellant.

Kevin Thomas O'Hanlon, Austin, Susan L. Wheeler, Houston, for appellees.

Before PAUL PRESSLER, MURPHY and ELLIS, JJ.

## OPINION

ELLIS, Justice.

Gulf Regional Education Television Affiliates (GRETA) and its director Katherine L. Buck sued the University of Houston (the University) and Florence M. Monroe, seeking damages for conversion of property and for interference with business activities and contractual relationships with third parties. On a Rule 12 Motion to Compel Attorney to Show Authority, the trial court ordered the suit dismissed without prejudice and filed findings of fact and conclusions of law. Ms. Buck's claim for wrongful termination was severed, and GRETA appealed, challenging both the trial court's conclusions of law and the use of Rule 12 to dismiss GRETA's claims. We affirm the order of the trial court.

The parties disagree as to GRETA's inception. GRETA maintains that it is an unincorporated association of Gulf Coast area independent school districts and parochial schools that was established in the 1960's to produce and broadcast instructional television programming to its members. While GRETA purchased broadcast time from KUHT, the public television station owned and operated by the University, GRETA claims it was not obligated to broadcast solely on KUHT. In its brief, GRETA states that it had a constitution and that its business was conducted by a board of directors in accordance with by-laws.

The association derived its income from its member school districts through local taxes and state funds (and private sources in the case of its member parochial schools). The board of directors, which consisted of fourteen representatives elected by the membership, set policy and ran the association, entering into contracts and purchasing facilities and equipment. The University, as fiscal agent, actually issued the checks and also provided security, utilities and accounting.

The University states a slightly different set of facts. It asserts that in the 1960's it formulated a proposal, in conjunction with several Houston area school districts, to make educational programs available to area students through broadcasts on KUHT. To implement the proposal, the

University established GRETA as an auxiliary enterprise of the University and hired a director to coordinate the purchase of air time from KUHT. The member school districts elected representatives to a board of directors, whose function was to advise KUHT of the members' wishes regarding programming. The University collected money on a per student basis from the members through GRETA, and the funds were deposited by the GRETA director in a University account from which the KUHT bill was paid.

In 1985, University auditors discovered that, at the direction of the GRETA board, GRETA director Katherine Buck had for several years been depositing the GRETA funds in an account at MBank Pasadena rather than in University accounts. The governing board of each state institution of higher education is directed to designate special depository banks to hold certain receipts of the institution, including those derived from auxiliary enterprises, separate and apart from funds that are deposited in the state treasury. Tex.Educ.Code Ann. § 51.008(a), (b) (Vernon 1987 & Supp. 1988). The University Board of Regents had not so designated MBank Pasadena. Upon this discovery, Florence Monroe, Associate Vice President for Public Service and Telecommunications, dismissed Ms. Buck as director. The University then discontinued GRETA as an auxiliary enterprise and assumed sole responsibility for educational programming at KUHT. The locks on the GRETA facility were changed, equipment seized and employees released.

The president of the GRETA board then contacted several board members by telephone and received authorization to hire an attorney to file a lawsuit against the University and Ms. Monroe. As defendants, the University and Ms. Monroe moved to compel plaintiff's attorney to show his authority to maintain suit on behalf of GRETA. They argued that GRETA is an auxiliary enterprise of the University, that the University is an arm of the State of Texas, and that only the Attorney General of Texas is authorized to bring suit on behalf of an arm of the state. At a hearing on the motion, defendants also questioned whether a quorum of the GRETA board had authorized the suit and whether GRETA is a public body subject to the Open Meetings Act.

The relevant findings of fact and conclusions of law are set forth as follows:

## FINDINGS OF FACT

3. GRETA is an auxiliary enterprise of the University of Houston.

6. GRETA has a Board of Directors elected from among the membership.

7. Since June 24, 1985, the GRETA Board has not met in a publicly called open meeting convened under the provisions of Art. 6252–17 V.A.T.S.

8. This suit was filed on February 20, 1986, by Mr. Jay S. Siskind, Attorney at Law on behalf of GRETA.

9. Authorization to bring this suit was made by Mr. Carl (sic) Thomas, Chairman of the GRETA Board, after informal telephone consultation with five GRETA Board members.

10. Six Board members do not constitute a quorum of the GRETA Board. This suit has not been authorized by a quorum of the GRETA Board at an open meeting.

11. Neither The Board of Regents nor the administration of the University of Houston System have authorized the filing of this suit.

12. The Office of the Attorney General of Texas did not authorize the filing of this suit.

## CONCLUSIONS OF LAW

1. Gulf Region (sic) Education Television Affiliates (hereinafter GRETA) is an auxiliary enterprise of the University of Houston and subject to governance by the Board of Regents of the University of Houston.

2. A suit brought by or on behalf of an auxiliary enterprise of the University

of Houston must be authorized by the Board of Regents of the University of Houston.

3. The GRETA Board is a public body within the meaning of the Texas Open Meetings Act. (V.A.T.S. Art. 6252–17).

4. No public body may take an official action unless it is taken at a public meeting.

5. Since the purported authorization to bring this suit was not taken at a public meeting it was void.

6. Plaintiff GRETA and attorney Jay Siskind were not authorized to file or maintain this suit against the University of Houston.

In its first of seven points of error, GRETA argues that the trial court erred in dismissing the suit because GRETA was an unincorporated association with authority to sue or be sued in its own behalf and was therefore authorized through its attorney of choice to file and maintain this suit. In point of error two, GRETA asserts that the court erred in concluding that GRETA was subject to governance by the University Board of Regents because it was an unincorporated association governed by its own board of directors. GRETA's third point of error is that because of its unincorporated association status, the trial court erred in concluding that GRETA and its attorney were not authorized to bring this suit and that a suit brought by GRETA must be authorized by the University.

Given the wording of the points of error, GRETA apparently does not challenge the trial court's findings of fact but rather challenges the conclusions of law. Thus, it is our duty to review the correctness of the legal conclusions drawn from the facts actually found. *Harry Hines Medical Center, Ltd. v. Wilson*, 656 S.W.2d 598, 603 (Tex.App.—Dallas 1983, no writ).

The principal issue is the nature of GRETA or, rather, that of an auxiliary enterprise. All parties agree that GRETA is an auxiliary enterprise of the University.

However, they disagree as to the resulting relationship between the two entities—specifically, whether GRETA is actually a part of the University subject to the latter's control. The University defines an auxiliary enterprise as a self-supporting component such as KUHT, the athletic department, the housing and food service programs and the bookstore. GRETA, on the other hand, likens its status to that of an unincorporated association.

Auxiliary enterprises are nowhere defined in the statutes or case law. Our information thus comes from the record, primarily through the testimony of Scott Chafin, University Counsel, and a letter written in 1972 to a GRETA board president by a University vice president. Chafin testified that at the University and at two other state universities at which he was employed, the term *auxiliary enterprise* has meaning insofar as budgeting and financial records are concerned. State universities derive their funds from a variety of sources (state appropriations, tuition and fees, contracts and grants, gifts and endowments). However, there are certain university operations that are self-supporting and are prohibited by law from being funded through those sources. It is these operations that traditionally have been called auxiliary enterprises.

The University apparently does not have to have direct control over an operation to consider it an auxiliary enterprise. For example, the housing operation is supported by dormitory rentals and is run by the University. The food operation, however, is run by an outside contractor with the University maintaining very close control over it. Both operations are considered auxiliary enterprises. Also, it is not uncommon for an auxiliary enterprise to have a board of trustees, a board of directors or an advisory board. When asked how University control manifests itself over an auxiliary enterprise such as GRETA, Chafin responded that the enterprise is managed by University employees who report through a particular chain of

command. GRETA's director, who was considered by the University to be a University employee and who was paid by the University through the University payroll office, reported to the officer who is in charge of telecommunications, Dr. Monroe. Dr. Monroe reports to the vice president for academic affairs, who in turn reports to the president of the University system. The chain of command is no different from that of an academic department or any other office or component of the University.

Chafin also testified that GRETA was subject to audit and financial controls by the University. When asked if the University was supposed to control GRETA's funds, Chafin answered that the University perceived its operation with GRETA as it does any situation in which it receives funds from outside, such as grant money. Once those funds arrive at the University, they are viewed as University funds. He reiterated that, according to section 51.008 of the Texas Education Code, funds from auxiliary enterprises are required to be maintained and controlled by the University subject to its internal financial mechanisms and placed in the University's depository bank.

Finally, Chafin testified that GRETA employees were considered to be University employees subject to the personnel policies and management procedures. The only distinction would be one of financial record keeping, that is, the origin of the funds to pay their salaries.

According to the testimony of Charles Thomas, GRETA board president, GRETA has operated as an auxiliary enterprise as defined in a letter written to the board in 1972. At that time a conflict had arisen over an increase in the fee the University charged GRETA to act as fiscal agent. The board attempted to get GRETA's relationship with the University defined, and Patrick Nicholson, Vice President of Development, responded with the letter. Its relevant sections are as follows:

Auxiliary enterprises are organizations or agencies which carry out various aspects of one or more of the University's three missions: teaching, research and public service. They are outside the normal structure of colleges, divisions, departments and schools of the University, but are part of the University "family".

Most of our auxiliary enterprises are administered by a University official, and simply follow overall University policy; several, however, including GRETA and ACT, have their own board of directors as a policy-making body.

The auxiliary enterprises are usually provided with certain indirect support, including housing, utilities, maintenance and accounting services; they are expected, however, to make their own way financially.

Where a separate directorate is involved, as in the case of GRETA and ACT, we expect that the governing body will make and implement policy. We hope that the University is consulted on matters affecting it, and this has been the case in virtually every instance I can recall involving auxiliary enterprises. We find it necessary for auxiliary enterprises to follow University policy on such details as employee classification systems, fringe benefits, rate of per diem, mileage, etc. Otherwise, there could understandably be varying degrees of difficulty in meshing operations of the auxiliary enterprises into the overall institution.

Because of the complexities of tax returns, record-keeping, fringe benefits, etc., auxiliary enterprise employees are employees of the University. We expect GRETA or similar organizations, nevertheless, to have a major role in the selection of personnel.

Auxiliary enterprises can and do enter directly into contracts, and receive grants and contributions. Large complex grants such as that for the "3, 4, 5 Club," however, are entered into by the University for a number of reasons, including policies and wishes of contracting agencies and companies who look finally and legally to the University for

fulfillment of large-scale agreements involving auxiliary enterprises.

GRETA claims that this letter defines the relationship between the two entities and the course of conduct that has evolved over the years. GRETA asserts that it operates outside the normal structure of the University and emphasizes that it is self-supporting, manages its own affairs, is able to enter into contracts and can receive grants and contributions from third parties. The argument is made that GRETA is an unincorporated association functioning as an auxiliary enterprise and is therefore able to sue or be sued. GRETA further argues that it is not an agency of the state as it was not created by specific legislative enactment nor established as a component of the University by the Education Code. Finally, the legislature has impliedly acknowledged that auxiliary enterprises are separate entities by not requiring that their funds be deposited in the state treasury. Those funds thus are not considered public funds belonging to institutions of higher learning. In sum, GRETA argues that as an auxiliary enterprise, it is independent of the University and of University control.

We must resolve this dispute in somewhat of a vacuum as the statutes and cases provide little guidance. However, after examining the record, we affirm the conclusions of law that GRETA is subject to governance by the Board of Regents and that a suit brought by or on its behalf must be authorized by the Board of Regents. While the University apparently allows its auxiliary enterprises to exercise varying degrees of autonomy, it retains ultimate responsibility for and control over those enterprises. This is clear from the testimony of Scott Chafin but is even clearer from the Nicholson letter on which GRETA relies for its assertion of independence.

The letter states that auxiliary enterprises are considered part of the University "family" and speaks of the necessity of following University policy on some matters to facilitate the meshing of their operations into the overall institution. Also, auxiliary enterprise employees are employees of the University. Even the language allowing auxiliary enterprises a *major* role in the selection of personnel suggests that the University reserves the option to participate. Finally, and most importantly, while auxiliary enterprises can enter directly into contracts, the University recognizes that, particularly in the case of major contracts, the contracting parties ultimately hold the University legally responsible.

■ We interpret the Nicholson letter as anticipating varying degrees of independence among the auxiliary enterprises at the University; we do not interpret it as relinquishing complete control. Furthermore, the fact that the legislature directs state institutions of higher education to deposit funds from auxiliary enterprise accounts into special depository banks rather than in the state treasury implies that the legislature assigns control over the funds, and consequently over auxiliary enterprises, to those institutions. We conclude that as an auxiliary enterprise, GRETA is part of the University and is therefore subject to governance by the University Board of Regents. The Board of Regents has the power to sue or be sued in the name of the University, Tex.Educ.Code Ann. § 111.33 (Vernon Supp.1988), and did not authorize the filing of this suit. GRETA and its attorney had no authority to bring this suit, and points of error one through three are overruled.

In points of error four and five, GRETA challenges the trial court's conclusions of law that GRETA is a public body within the meaning of the Texas Open Meetings Act, that no public body may take an official action unless it is taken at a public meeting, and that the purported authorization to bring this suit was void because it was not taken at a public meeting. GRETA argues that as an unincorporated association composed of independent school districts and private parochial schools, it does not meet the definition of a public body and is therefore not subject to the Act.

■ The statute at issue prohibits governmental bodies from holding meetings

which are closed to the public. Tex.Rev. Civ.Stat.Ann. art. 6252–17 (Vernon Supp. 1988). Briefly, the Act is applicable if the following five prerequisites are met:

(1) The body must be an entity within the executive or legislative department of the state;

(2) The entity must be under the control of one or more elected or appointed members;

(3) The meeting must involve formal action or deliberation between a quorum of members.

(4) The discussion or action must involve public business or public policy.

(5) The entity must have supervision or control over that public business or policy.

Op.Tex.Att'y Gen. No. H–772 (1976).

Without an exhaustive analysis, we find support for the trial court's conclusions. First, GRETA is an auxiliary enterprise of the University, and the latter, as a state-supported university, is part of the executive branch of the state. See Op.Tex.Att'y Gen. No. H–772 (1976) (general faculty of a state college or university and Texas Tech Athletic Council clearly satisfy the first prerequisite). Second, the member schools elected a board of directors to formulate policy and to run the organization through its officers, general manager and employees. Third, the record suggests that board action required the approval of a quorum (at least one-half) of the board. Fourth, the board's business involved the expenditure of some public funds (the local taxes and state funds from which GRETA derived part of its income) and concerned public education. Fifth, there is no question that the University looked to GRETA to operate educational programming in conjunction with KUHT and chose to exert little control over that particular auxiliary enterprise. Thus, the trial court's conclusions of law were correct, and the GRETA board's action to hire an attorney was void because it was not taken in a public meeting. See Lower Colorado River Authority v. City of San Marcos, 523 S.W.2d 641, 646

(Tex.1975). Points of error four and five are thus overruled.

■ GRETA next asserts that the trial court erred in failing to find requested additional and amended findings of fact and conclusions of law as those additional findings and conclusions are consistent with the evidence and applicable law herein and dispositive of the question of GRETA's authority to bring this suit. The trial court is not required to make requested additional findings, however, when they are covered by and directly contrary to the original ones filed by the court. Shelby International, Inc. v. Wiener, 563 S.W.2d 324, 328 (Tex.Civ.App.—Houston [1st Dist.] 1978, no writ). Furthermore, the requested additional and amended findings of fact and conclusions of law were not dispositive of GRETA's authority to bring this suit and would not have required a different result if made. Id. Point of error six is overruled.

■ GRETA's final point of error is that the trial court erred in using Tex.R.Civ.P. 12 to dismiss the claim because by its action the court decided the ultimate fact issue and thereby deprived GRETA of its right to a trial on the merits. GRETA argues that the court misapplied Rule 12, which is intended to be used to prevent an attorney from purporting to represent a client when the client has not authorized that representation. The court instead used the rule to determine the nature of GRETA and thus whether GRETA had the authority to hire an attorney.

GRETA's argument is a somewhat narrow interpretation of the rule. Several cases, including one cited by GRETA, illustrate that a Rule 12 motion has been used to question whether a party has the power or authority to hire an attorney. In Angelina County v. McFarland, the respondent sought to dismiss an application for writ of error on the ground that the county and the sheriff, who previously had been represented by the county judge, could not be represented by a private law firm when the

county judge had not withdrawn and the commissioners' court had not authorized that representation. 374 S.W.2d 417 (Tex. 1964). The use of the rule would have been proper in that context except that it was the plaintiff who challenged the representation, and the supreme court held that the rule authorized only defendants to do so. *Id.* at 423. (That limitation was removed in the 1981 changes in the Rules of Civil Procedure.) *See also Victory v. State*, 138 Tex. 285, 158 S.W.2d 760 (Tex. Comm'n App.1942, opinion adopted) (challenging the authority of an attorney who was not the county attorney to represent the state in a delinquent tax suit); *Cook v. City of Booker*, 167 S.W.2d 232 (Tex.Civ. App.—Amarillo 1942, no writ) (attacking the authority of nonresident attorneys to represent the City of Booker and the Booker Independent School District). Thus, we find no error in the use of Rule 12 to dismiss GRETA's claim, and point of error seven is overruled.

We affirm the trial court's order.