# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 14, 2022

Lyle W. Cayce
Clerk

No. 20-20503

CANADA HOCKEY, L.L.C., DOING BUSINESS AS EPIC SPORTS;
MICHAEL J. BYNUM,

*Plaintiffs—Appellants*,

*versus*

TEXAS A&M UNIVERSITY ATHLETIC DEPARTMENT; ALAN
CANNON; LANE STEPHENSON, IN HIS INDIVIDUAL CAPACITY,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-181

ON PETITION FOR REHEARING

Before OWEN, *Chief Judge*, SMITH and GRAVES, *Circuit Judges*.
JAMES E. GRAVES, JR., *Circuit Judge*:*

---

* Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-20503

IT IS ORDERED that the petition for rehearing is DENIED. The opinion, filed September 8, 2021, is WITHDRAWN, and the following is SUBSTITUTED:

Michael J. Bynum and his publishing company sued Texas A&M University and its employees after they published a part of Bynum's forthcoming book without permission. Relevant here, the district court dismissed all claims against Texas A&M on state sovereign immunity grounds and those against two Texas A&M employees for failure to state a claim. We AFFIRM.

## I. Background

For purposes of this appeal, we accept the factual allegations stated in the complaint as true. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Michael J. Bynum is a sportswriter and editor that operates his own publishing company, Canada Hockey LLC d/b/a Epic Sports ("Epic Sports"). In 1980, Bynum became interested in the "12th Man" lore while working on his first book about Texas A&M University's (TAMU) football program. Plaintiffs describe the 12th Man story as follows:

> The University's now famous 12th Man tradition was inspired by the actions of E. King Gill at the 1922 football game known as the "Dixie Classic." Gill, a squad player for A&M's football team, who was already training with the university's basketball team, was up in the press box watching his team face the then top-ranked Prayin' Colonels of Centre College, when he was waved down to the sideline before halftime to suit up in case his injured team ran out of reserve players. Gill stood on the sideline, ready to play, for the remainder of the game.
>
> Gill's commitment to step up for his team when in need later became a legend that was passed down from generation to generation of Aggies. Today, the 12th Man tradition is a symbol of the Aggies' unity, loyalty, and willingness to serve when

2

called upon to do so, and is woven into many aspects of life at
A&M.

In 1990, TAMU registered "12th Man" as a trademark and has since aggressively enforced it.

Intrigued by the story, Bynum decided to write about Gill and his impact on TAMU's football program for a forthcoming book titled *12th Man*. For many years, Bynum researched Gill and the 12th Man story, including reviewing primary documents, visiting relevant locations, and conducting interviews with personnel in TAMU's Athletic Department. The personnel included Brad Marquardt, an Associate Director of Media Relations, and Alan Cannon, an Assistant Athletic Director for Media Relations. Marquardt reported to Cannon and managed the Athletic Department's official Twitter account dedicated to its football program (@AggieFootball). Cannon handled media relations for all sports programs in the Athletic Department and managed the department's official website. Eventually, Bynum hired Whit Canning to write a short biography about Gill (the "Gill Biography"), titled "An A&M Legend Comes to Life," which Bynum planned to use as the opening chapter of his book.

In June 2010, Bynum emailed Marquardt seeking photographs to include in his book, sending along a draft of the book in PDF form. In the email, Bynum specified that the PDF was "a draft version of the 12th Man Book" and "a work in progress . . . not in final form yet." The draft contained Bynum's name, copyright date, an indication that Epic Sports owned the copyright to the book, and a statement that "no part of the book may be reproduced or used in any form or by any means . . . without the permission of the publisher." The Gill Biography was the opening chapter of the book. Bynum continued to email Marquardt as late as December 2013, asking questions related to the book. Bynum planned to publish his *12th Man* book in the fall of 2014.

No. 20-20503

In January 2014, TAMU's Athletic Department directed its staff to find background information on Gill that could be used to promote the 12th Man story and raise money. Marquardt directed his secretary to retype the Gill Biography that Bynum sent to Marquardt in 2010; remove any references to Bynum or Epic Sports; rewrite the byline to read "by Whit Canning, special to Texas A&M Athletics" to suggest that Canning was commissioned to write the Biography exclusively for the Athletic Department; and change the original title of the Biography from "An A&M Legend Comes to Life" to "The Original 12th Man." Marquardt provided the retyped Biography to his work colleagues, including Cannon and Lane Stephenson, the Director of News & Information Services at TAMU, for approval and publication. Stephenson was in charge of TAMU's official Twitter account (@TAMU) and "TAMU Times," which was TAMU's e-newsletter and website.

Soon after, the Athletic Department published the contents of the Gill Biography as an article on its website. Then, on January 19, 2014, both TAMU and its Athletic Department tweeted a link to the article on their respective Twitter accounts. The posts were retweeted and discussed by news sources. The article was also featured in TAMU Times.

On January 22, 2014, Bynum emailed Marquardt and another employee of the Athletic Department requesting immediate removal of the article. Several hours later, Marquardt responded that the article was no longer on the website, apologized for the "mix-up," and asked whether it would "be possible to post the story as an 'excerpt' to [his] book." He also stated: "I asked my secretary to key [the Biography] in for me which she did." Though the article was removed, it was shared by others and reposted on various online forums. The book remains unpublished.

No. 20-20503

In 2017, Bynum and Epic Sports filed suit against the TAMU Athletic Department, the TAMU 12th Man Foundation,[1] and employees of the Athletic Department. Relevant here, Plaintiffs assert the following claims: (1) direct copyright infringement under the Copyright Remedy Clarification Act (CRCA), 17 U.S.C. § 501, against the Athletic Department, Cannon, and Stephenson; (2) contributory copyright infringement against the same; (3) vicarious copyright infringement[2] against the Athletic Department; (4) violation of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 1202, against the Athletic Department; (5) violation of the Takings Clause of the Texas Constitution against the Athletic Department; and (6) violation of the Takings Clause of the U.S. Constitution against the Athletic Department.

TAMU, on behalf of the Athletic Department, moved to dismiss the claims for lack of jurisdiction on state sovereign immunity grounds under Federal Rule of Civil Procedure 12(b)(1). Cannon and Stephenson moved to dismiss the claims for failure to state a claim under Rule 12(b)(6) and on qualified immunity grounds. In March 2019, the district court dismissed those claims, but later stayed the case pending the Supreme Court's decision in *Allen v. Cooper*, 140 S. Ct. 994 (2020). In September 2020, after *Allen* was decided and additional briefing was submitted, the district court entered final judgment for TAMU, Cannon, and Stephenson. Plaintiffs appeal.

---

[1] Pursuant to a joint motion, the appeal as to the 12th Man Foundation was dismissed.

[2] A direct copyright infringement claim stems directly from the CRCA, but a contributory or vicarious infringement claim does not. Nevertheless, though "[the CRCA] does not expressly render anyone liable for infringement committed by another, these doctrines of secondary liability emerged from common law principles and are well established in the law." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (internal quotation marks and citations omitted).

No. 20-20503

## II. Standard of Review

"We review de novo a district court's grant of a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction because of state sovereign immunity." *Meyers ex rel. Benzing v. Texas*, 410 F.3d 235, 240 (5th Cir. 2005). A plaintiff bears the burden of proof that jurisdiction exists. *Daniel v. Univ. of Tex. Sw. Med. Ctr.*, 960 F.3d 253, 256 (5th Cir. 2020). While legal conclusions are reviewed de novo, the district court's factual findings are reviewed for clear error. *Kuwait Pearls Catering Co. v. Kellogg Brown & Root Servs., Inc.*, 853 F.3d 173, 178 (5th Cir. 2017).

We review de novo a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *Thurman v. Med. Transp. Mgmt., Inc.*, 982 F.3d 953, 955 (5th Cir. 2020). We accept all well-pled factual allegations as true, viewing them in the light most favorable to the plaintiff. *Id.*

## III. State Sovereign Immunity

State sovereign immunity divests federal courts of jurisdiction over states and their agencies and instrumentalities, unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity. *See* U.S. Const. amend. XI; *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 326 (5th Cir. 2002). "The state need not be the named party in a federal lawsuit, for a state's Eleventh Amendment immunity extends to any state agency or entity deemed an 'alter ego' or 'arm' of the state." *Id.*[3] TAMU is inarguably an arm of the state entitled to sovereign immunity. *See*

---

[3] "'Eleventh Amendment immunity' is a misnomer, however, because that immunity is really an aspect of the Supreme Court's concept of state sovereign immunity and is neither derived from nor limited by the Eleventh Amendment. Nevertheless, the term 'Eleventh Amendment immunity' has been used loosely and interchangeably with 'state sovereign immunity' to refer to a state's immunity from suit without its consent in federal courts." *Meyers*, 410 F.3d at 240–41 (citations omitted).

*U.S. Oil Recovery Site Potentially Responsible Parties Grp. v. R.R. Comm'n of Tex.*, 898 F.3d 497, 501 (5th Cir. 2018).

As noted above, a state's immunity from suit is not absolute. With respect to abrogation, a federal court may entertain a lawsuit against a nonconsenting state on two conditions: "First, Congress must have enacted 'unequivocal statutory language' abrogating the States' immunity from the suit. . . . And second, some constitutional provision must allow Congress to have thus encroached on the States' sovereignty. Not even the most crystalline abrogation can take effect unless it is 'a valid exercise of constitutional authority.'" *Allen*, 140 S. Ct. at 1000–01 (citations omitted).

## IV. Claims Against TAMU

Appellants argue that the district court improperly dismissed their claims against TAMU on several grounds. They assert that the Athletic Department is a separate entity from TAMU and is therefore not an arm of the state entitled to sovereign immunity. But even if it were, the district court should not have dismissed the copyright infringement and takings claims against TAMU. We address each issue in turn.

### A. Arm of the State

The district court held that, as a matter of law, the Athletic Department lacks jural authority and therefore has no capacity to be sued under Federal Rule of Civil Procedure 17. Since the "correct party" substitute should be TAMU, the district court held that TAMU, as an arm of the state, was entitled to sovereign immunity.

The parties do not dispute that the Athletic Department lacks jural authority to be sued. However, they disagree as to whether the district court failed to do a full analysis of the Athletic Department's arm-of-the-state status under the framework set forth in *Clark v. Tarrant County*, 798 F.2d 736

(5th Cir. 1986). In other words, Appellants assert that the *Clark* framework should have been applied, which would have led to the conclusion that the Athletic Department itself can be sued, whereas Appellees contend that a *Clark* analysis was not required because TAMU is the proper party.

We agree with Appellants that under circuit precedent, a court must analyze whether an entity qualifies as an arm of the state as a matter of law under the *Clark* framework. *See Williams v. Dallas Area Rapid Transit*, 242 F.3d 315, 318–19 (5th Cir. 2001) ("When confronted with a governmental entity asserting Eleventh Amendment immunity as an arm of the state, we apply the test established in *Clark* . . . .") (holding that the district court "erred in failing to properly analyze, under *Clark*, [the entity's] amenability to suit"). A proper inquiry under *Clark* considers six factors: (1) whether the state statutes and caselaw view the agency as an arm of the state; (2) the source of funds for the entity; (3) the degree of local autonomy the entity enjoys; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property. *Clark*, 798 F.2d at 744–45. No one factor is dispositive, though it is well established that the second is the "most important," while the fifth and sixth are "less so." *Williams*, 242 F.3d at 319 (citing *Hudson v. City of New Orleans*, 174 F.3d 677, 681–82 (5th Cir. 1999)). "The goal of this test is to determine 'whether the suit is in reality a suit against the state itself.'" *Providence Behavioral Health v. Grant Rd. Pub. Util. Dist.*, 902 F.3d 448, 456 (5th Cir. 2018) (quoting *Hudson*, 174 F.3d at 682).

The first factor—state law and caselaw—favors treating the Athletic Department as an arm of the state. Neither party points to a statute, case, or a Texas Attorney General opinion relevant to any athletic department of a state university. Texas law, however, suggests that an athletic department of a public university is essentially an "auxiliary enterprise" that is an extension

of the state. An "auxiliary enterprise" is defined as "a business activity that is conducted at a state agency, provides a service to the agency, and is not paid for with appropriate money." TEX. GOV'T CODE § 2252.061. Auxiliary enterprises, like athletic departments, do not operate for purely educational purposes. *See* TEX. CONST. art. VII, §§ 17(f)[4] & 18(d).[5] But these enterprises are nevertheless treated as an extension of a public university. *See, e.g., Gulf Reg'l Educ. Television Affiliates v. Univ. of Hous.*, 746 S.W.2d 803, 808 (Tex. Ct. App. 1988) (concluding that group of school districts and parochial schools that produced and broadcast television programming was auxiliary enterprise of University of Houston and had no authority to file suit without university or State Attorney General's permission). Further, courts have treated athletic departments as auxiliary enterprises. *See id.* (noting that the "University defines an auxiliary enterprise as a self-supporting component such as . . . the athletic department"); *Kneeland v. Nat'l Collegiate Athletic Ass'n*, 850 F.2d 224, 226–27 (5th Cir. 1988) (observing unchallenged district court ruling that "athletic departments of Texas state universities were auxiliary enterprises"); *see also* Tanyon T. Lynch, *Quid Pro Quo: Restoring Education Primary to College Basketball*, 12 Marq. Sports L. Rev. 595, 607 n.89 (2002) ("Most Division I-A athletics departments are considered 'auxiliary enterprises' and, as such, are expected to generate revenues sufficient to cover costs."). Since an athletic department of a state-supported university is like an auxiliary

---

[4] "The funds appropriated by this section [for educational and general activities] may not be used for the purpose of constructing, equipping, repairing, or rehabilitating buildings or other permanent improvements that are to be used only for student housing, intercollegiate athletics, or auxiliary enterprises."

[5] "The proceeds of the bonds or notes issued under Subsection (a) or (b) of this section may not be used for the purpose of constructing, equipping, repairing, or rehabilitating buildings or other permanent improvements that are to be used for student housing, intercollegiate athletics, or auxiliary enterprises."

enterprise, the Athletic Department is similarly an extension of TAMU and thus an arm of the state.

The second factor—source of funds—favors treating the Athletic Department as an arm of the state. Though we consider the source of general operating funds for the entity, because a principal goal of the Eleventh Amendment is to protect state treasuries, the most significant factor in assessing an entity's status is whether a judgment against it will be paid with state funds. *Williams*, 242 F.3d at 320 (citing *Richardson v. S. Univ.*, 118 F.3d 450, 452 (5th Cir. 1997)). Texas law prohibits any public funds to be used for intercollegiate athletic programs, as it requires these programs to be fully self-supporting. *See* TEX. CONST. art. VII, §§ 17(f) & 18(d); Tex. General Appropriations Act, 86th Leg., R.S., art. III, § 9 ("[N]o educational and general funds appropriated may be used for the operation of intercollegiate athletics."). Thus, the Athletic Department relies wholly on outside funding. For instance, in the fiscal year of 2016, it generated approximately $194 million in revenue from, *inter alia*, ticket sales, contributions, sale of media rights, and advertisements. It receives $0 in student fees, direct state or other government support, direct institutional support from TAMU, and indirect facilities and administrative support.

But while the source of the Athletic Department's operating funds is private, it is unclear whether a judgment against the Athletic Department would be satisfied with private or state-allocated funds. Appellants have the burden to demonstrate that the Athletic Department will be responsible for its judgment and debts, not the State. Because they fail to satisfy their burden in this respect, this factor supports a finding that the Athletic Department is an arm of the state. *See Daniel*, 960 F.3d at 258 (concluding second factor favors finding immunity because plaintiff failed to satisfy burden of showing that entity would be responsible for judgment and debt, not the state).

The third factor—degree of autonomy—favors treating the Athletic Department as an arm of the state. The record shows that the Athletic Department is a department within, and governed by, TAMU. Scott Woodward, the Director of Athletics at TAMU, averred: "I report directly to the President of Texas A&M University, Michael K. Young. President Young and I stay in frequent contact regarding how the Athletic Department is performing." The organizational chart provided by TAMU indicates that Woodward is part of the TAMU President's cabinet and reports directly to the President. *Cf. Gulf*, 746 S.W.2d at 806–07 (concluding that auxiliary enterprise was part of state university where enterprise was managed by university employees who reported through chain of command that went up to the university's president). Moreover, policy statements issued by the TAMU System Board of Regents demonstrate that TAMU exercises oversight over the Athletics Department. For example, the Board requires TAMU to "create and maintain an Athletic Council, made up of faculty, staff, students, alumni, and community members, to advise the president in the development and administration of the intercollegiate athletics program," and that "all intercollegiate athletics programs be maintained in an academically and fiscally accountable manner with full compliance with conference and national rules." TAMU also requires athletic agreements over $100,000 to be authorized by a university official—generally the University Contracts Officer, the Chief Financial Officer, or the President. Further, all athletic coaching employment agreements must be authorized by the President, and, if over $500,000, with additional approval by the Board of Regents. Considering TAMU's oversight and financial regulation, the Athletic Department does not operate with a level of local autonomy to consider it independent from the State.

The fourth factor—scope of problem—favors treating the Athletic Department as an arm of the state. Education is a statewide concern, *see*

*Sissom v. Univ. of Tex. High Sch.*, 927 F.3d 343, 349 (5th Cir. 2019), and though athletic programs do not operate for educational purposes, anyone who plays a sport managed by the Athletics Department is a student at TAMU, which belongs to the statewide TAMU System. *See United States ex rel. King v. Univ. of Tex. Health Sci. Ctr.–Hous.*, 544 F. App'x 490, 495 (5th Cir. 2013) (finding that University of Texas Health Science Center addressed statewide concerns of education and research, although its facilities were all in Houston, as the center belonged to the greater University of Texas System which had locations throughout the state). Further, the Athletic Department engages in intercollegiate athletics—i.e., competes with other schools—and derives financial support from students, alumni, and fans throughout Texas. *Clark*'s fourth factor therefore supports finding the Athletic Department as an arm of the state.

The fifth factor—ability to sue and be sued in its own name—favors finding the Athletic Department as an arm of the state. Neither party points to a case in which the department was a named party in a lawsuit.

The sixth factor—right to hold and use property—favors treating the Athletic Department as an arm of the state. The Board of Regents retains ultimate control of money collected at TAMU, including "receipts from school activities." Tex. Educ. Code § 51.002; *see Kneeland*, 850 F.2d at 226–27 (observing unchallenged district court ruling that funds generated by athletic departments of state universities were "public funds belonging to the State of Texas"). The Athletic Department does not own or purchase real property, and any real property used by the Athletic Department is managed by the Board of Regents. Tex. Educ. Code § 85.25 ("The board is vested with the sole and exclusive management and control of lands and mineral interests under its jurisdiction and that may be acquired by it.").

No. 20-20503

All six *Clark* factors weigh in favor of finding that the Athletic Department is entitled to arm-of-the-state status. Accordingly, we conclude that the Athletic Department is a part of TAMU and therefore enjoys state sovereign immunity.

## B. Copyright Infringement Claims

Having concluded that the Athletic Department is an arm of the state, we must next address whether its sovereign immunity is abrogated from the copyright infringement claims. Because the Athletic Department is an extension of TAMU, we will now refer to the entity as TAMU.

### i. Abrogation

In *Allen v. Cooper*, 140 S. Ct. 994 (2020), the Supreme Court recently addressed whether the Copyright Remedy Clarification Act (CRCA) validly abrogated the states' immunity from copyright infringement suits.[6] The CRCA provides that a state "shall not be immune, under the Eleventh Amendment [or] any other doctrine of sovereign immunity, from suit in Federal court" for copyright infringement. 17 U.S.C. § 511(a). Though Congress used clear language to abrogate immunity, the Court held that Congress had no authority to do so under Article I, which empowers Congress to protect copyrights, or Section 5 of the Fourteenth Amendment, which authorizes Congress to enact "reasonably prophylactic legislation" aimed at preventing states from violating the Fourteenth Amendment. *Allen*, 140 S. Ct. at 1004 (citations omitted). With respect to Section 5, the CRCA failed the "congruence and proportionality" test because the evidence of actual constitutional injury—that is, willful copyright infringement by

---

[6] The Fifth Circuit addressed this question many years ago and concluded that the CRCA was not a valid abrogation of state sovereign immunity from copyright infringement suits. *See Chavez v. Arte Publico Press*, 204 F.3d 601, 605 (5th Cir. 2000).

states—was "exceedingly slight." *Id*. at 1007. Congress therefore lacked authority to broadly abrogate the states' immunity from copyright infringement suits.

Appellants argue, however, that *Allen* did not foreclose abrogation of sovereign immunity from copyright infringement suits where a state's violation of the CRCA independently constitutes an *actual* violation of the Fourteenth Amendment. Specifically, they allege that TAMU committed two independent violations of the Fourteenth Amendment: (1) deprivation of property without due process, and (2) takings. Appellants cite to *United States v. Georgia*, 546 U.S. 151 (2006), which held that "insofar as Title II [of the Americans with Disabilities Act] creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." *Id*. at 159 (emphasis in original) (reviewing whether state violated prisoner's Eighth Amendment right to be free from cruel and unusual punishment, which is incorporated in the Due Process Clause of the Fourteenth Amendment).

Thus, *Georgia* arguably set forth two categories of abrogation: (1) where a statute validly abrogates sovereign immunity for *all* claims, and (2) where a statute is not a valid prophylactic abrogation of all claims, but does abrogate sovereign immunity for those claims based on conduct constituting an actual violation of the Fourteenth Amendment, for the statutory remedy would be congruent and proportional *as applied* to that case. *See id*. (directing lower courts to determine "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid"). Appellants contend that this case falls in the second category.

No. 20-20503

In support of their position, Appellants cite to *National Association of Boards of Pharmacy v. Board of Regents of the University System of Georgia* ("*NABP*"), 633 F.3d 1297 (11th Cir. 2011), where the Eleventh Circuit applied *Georgia* in a copyright infringement suit, observing that "[i]t is well established that § 5 grants Congress the authority to abrogate state sovereign immunity for violations of the Fourteenth Amendment." *Id.* at 1315 (citing *Georgia*, 546 U.S. at 158). There, however, the court ultimately rejected the plaintiff's claim that the copyright infringement amounted to a violation of procedural due process, concluding that a pre-deprivation process was not feasible under the facts alleged and that adequate post-deprivation remedies were provided by the State. *Id.* at 1318–19. Appellants also point to oral argument in *Allen*, where the State of North Carolina conceded that even if the Supreme Court held that the CRCA was not a valid prophylactic abrogation of state immunity, *Georgia* would still provide a remedy for copyright infringement constituting an actual violation of the Fourteenth Amendment. *See* Transcript of Oral Argument at 39–40, *Allen v. Cooper*, 140 S. Ct. 994 (2020) (No. 18-877) ("[W]henever a plaintiff can reasonably allege that there has been intentional copyright infringement and there are not adequate remedies, then, under this Court's *Georgia* decision, they can bring a direct constitutional claim. We don't dispute that."). Further, after *Allen* was decided, the district court on remand recently held that the plaintiffs' copyright infringement claim could still proceed because "[a]lthough the Supreme Court ruled that the CRCA was unconstitutional insofar as it attempted to abrogate sovereign immunity prophylactically . . . the statute remains whenever plaintiff alleges both a constitutional violation as well as a statutory violation. Therefore, plaintiffs can still use the CRCA as a basis for its *Georgia* claim [alleging that defendants' conduct amounted to an unconstitutional taking]." *Allen v. Cooper*, -- F. Supp. 3d --, 2021 WL 3682415, at *11 (E.D.N.C. Aug. 18, 2021).

15

No. 20-20503

### *ii. Actual Violations of the Fourteenth Amendment*

We need not decide whether *Georgia* extends to copyright infringement cases, because even assuming it does, Appellants fail to allege that TAMU's conduct constitutes an actual violation of the Fourteenth Amendment.

First, the copyright infringement claim against TAMU for deprivation of property without due process cannot survive dismissal. To come within the reach of the procedural requirements of the Due Process Clause, a violation must (1) be "intentional, or at least reckless," and (2) lack adequate post-deprivation state remedies. *Allen*, 140 S. Ct. at 1004. For due process purposes, copyrights are a form of property. *Id.* Appellants sufficiently allege that the infringement was intentional—Marquardt directed his secretary to retype the Gill Biography, remove any copyright information, and change its title and byline to indicate that TAMU owned the work, and then shared it with his colleagues for approval and publication.

However, meaningful post-deprivation state remedies are available to redress the injury. Though no tort remedies are available under Texas law,[7] Appellants have a viable takings claim against TAMU for copyright infringement under the Texas Constitution. More expansive than the federal Takings Clause, the Texas Takings Clause provides: "No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made." Tex. Const. art. I, § 17. The Clause

---

[7] Texas has not waived its immunity from tort claims arising out of copyright infringement allegations. *See* Tex. Civ. Prac. & Rem. Code § 101.021(1) (providing for limited waiver of governmental immunity for claims of property damage, personal injury, or death proximately caused by wrongful or negligent conduct of governmental employee arising out of (1) use of publicly owned motor-driven equipment or motor vehicle, (2) premises defects, and (3) conditions or uses of certain property).

itself waives sovereign immunity for a valid takings claim brought in state court. *Texas v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007). Though the Texas Supreme Court recently held that a public university's single act of copyright infringement—i.e., displaying a photograph on its website without the owner's authorization—did not constitute a *per se* taking, it nevertheless left the door open for a copyright owner to bring a regulatory takings claim against the State for infringement. *Jim Olive Photography v. Univ. of Hous.*, -- S.W.3d --, 2021 WL 2483766, at *9 (Tex. June 18, 2021); *see also id.* (Busby, J., concurring) ("Nothing in the Court's opinion should be understood to indicate a view on [whether a state's copyright infringement could in some circumstances require compensation] because Olive has alleged no claim under the 'damaged' or 'applied' prongs of the Texas Takings Clause."). Accordingly, because Appellants are not foreclosed from pursuing a takings claim in state court, TAMU did not violate their procedural due process rights. *See McClure v. Biesenbach*, 355 F. App'x 800, 805 (5th Cir. 2009) ("Post-deprivation process is adequate if it allows the prospect of compensation for the loss.") (citing *Parratt v. Taylor*, 451 U.S. 527, 543–44 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)).

Moreover, the copyright infringement claim against TAMU for its taking of property fails to survive dismissal as well. The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. CONST. amend. V. The Takings Clause is made applicable to the states by incorporation through the Due Process Clause of the Fourteenth Amendment. *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (citing *Chicago Burlington & Q.R.C. v. Chicago*, 166 U.S. 226 (1897)). The Supreme Court has not addressed whether copyrights are a form of property

protected by the Takings Clause.[8] And we need not decide this issue because Appellants have failed to plausibly allege a taking.

The Supreme Court has explained that a "basic distinction" exists between "individual torts" and "appropriations of a property right." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2078 (2021); *see also, e.g., Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 329–30 (1922) ("[W]hile a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove [the intent to take property]. Every successive trespass adds to the force of the evidence.").

This court has illuminated the principle that not all torts (i.e., infringements) rise to the level of a taking. In *Porter v. United States*, 473 F.2d 1329, 1337 (5th Cir. 1973), where the widow of Lee Harvey Oswald sought compensation for the taking of property by the United States, we held:

> We turn finally to the question whether Mrs. Porter can recover for the diminution in value of Oswald's writings attributable to their publication in the Warren Commission Report. It is, of course, quite plain that the recovery sought here is for infringement by the government of Mrs. Porter's common law copyright interest in Oswald's writings. Such infringement is not a "taking" as the term is constitutionally

---

[8] The Supreme Court, however, has recognized that other forms of intellectual property are protected by the Takings Clause. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 359–60 (2015) (patents); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003 (1984) (trade secrets). And, a handful of sister circuits have suggested that copyrights are protected by the Takings Clause. *See CCC Info. Servs., Inc. v. Maclean Hunter Market Reports, Inc.*, 44 F.3d 61, 74 (2d Cir. 1994) ("[A] rule that the adoption of such a reference by a state legislature or administrative body deprived the copyright owner of its property would raise very substantial problems under the Takings Clause of the Constitution."); *Lane v. First Nat'l Bank of Boston*, 871 F.2d 166, 174 (1st Cir. 1989) (suggesting if state remedies do not afford just compensation for copyright infringement, "the Takings Clause of the federal Constitution might at that point enable [owner] to pursue a damage remedy in federal court").

understood. Rather, it has always been held that infringement of copyright, whether common law, *Twentieth Century Fox Film Corp. v. Dieckhaus*, 153 F.2d 893 (CA 8, 1948), or statutory, *Turton v. United States*, 212 F.2d 354 (CA 6, 1954) constitutes a tort.

Like *Porter*, Appellants have failed to meet their burden that the purported infringement amounts to a constitutional taking: The alleged direct infringement was the public display of the book for four total days, and the indirect infringement likewise stems from these four days. Appellants have failed to plausibly allege that TAMU continued or repeated any infringement—direct or indirect—such that the claim amounts to a taking for Fifth Amendment purposes. Accordingly, in these circumstances, the copyright infringement claim based on a takings allegation fails.

## C. Takings Claims

We next address whether TAMU's sovereign immunity is abrogated from the federal and state takings claims, which were pleaded in the alternative to the copyright infringement claims.

A state is entitled to sovereign immunity from a federal takings claim. *Bay Point Props., Inc. v. Miss. Transp. Comm'n*, 937 F.3d 454, 457 (5th Cir. 2019) (affirming dismissal of takings claim against Mississippi on sovereign immunity grounds). Appellants argue, however, that immunity is abrogated when no remedy is available in state court. They cite to *Williams v. Utah Department of Corrections*, 928 F.3d 1209, 1213 (10th Cir. 2019), which suggests that a takings claim is barred only "as long as a remedy is available in state court." Because we have concluded that Appellants can pursue a claim under the Texas Takings Clause, state sovereign immunity bars the federal takings claim here. *See supra* IV.B.

A state is also entitled to sovereign immunity from a state takings claim brought in federal court. In *Pennhurst State School and Hospital v.*

*Halderman*, 465 U.S. 89, 119–21 (1984), the Supreme Court held that federal courts are barred from hearing state law claims against a state, reasoning that such claims cannot be maintained because supplemental jurisdiction does not abrogate the state's sovereign immunity. Further, even though the Texas Takings Clause waives immunity for state takings claims brought in state court, "[w]aiver of sovereign immunity in state courts does not waive Eleventh Amendment immunity from suit in federal court." *Guetersloh v. Texas*, 25 F.3d 1044 (5th Cir. 1994) (unpublished) (citing *Pennhurst*, 465 U.S. at 99 n.9). Accordingly, sovereign immunity bars the state takings claim.

### V. Claims Against Cannon and Stephenson

Lastly, we address the direct copyright infringement claim against Cannon, and the contributory copyright infringement claims against Cannon and Stephenson.

### A. Direct Copyright Infringement

Direct copyright infringement requires proof of two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *BWP Media USA, Inc. v. T&S Software Assocs., Inc.*, 852 F.3d 436, 439 (5th Cir. 2017) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). The purported infringer must have acted with "volitional conduct," *id.*—that is, "[t]here must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner." *Id.* at 440 (quoting *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550 (4th Cir. 2004)) (internal quotation marks omitted).

The allegations do not support the reasonable inference that Cannon directly infringed the copyright. Marquardt did the actual recopying—he, not Cannon, retyped the Gill Biography and scrubbed off all copyright

information to present it as TAMU's work. Cannon never received the original work and only received the infringed work from Marquardt. He had no actual or constructive knowledge of the infringement. Accordingly, we affirm dismissal of the direct copyright infringement claim against Cannon for failure to state a claim.

## B. Contributory Copyright Infringement

"Contributory infringement is 'intentionally inducing or encouraging direct infringement.'" *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 798 (5th Cir. 2017) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)). In other words, "[a] party is liable for contributory infringement when it, 'with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another.'" *Alcatel USA, Inc. v. DGI Technologies, Inc.*, 166 F.3d 772, 790 (5th Cir. 1999) (citation omitted).

The allegations do not support the reasonable inference that Cannon or Stephenson contributorily infringed the copyright. Again, Cannon had no knowledge of the underlying infringement—he never received the original work and only received the infringing article from Marquardt. There was no intent or even knowledge on Cannon's part with respect to the infringement. Further, Stephenson also lacked the requisite knowledge or intent to commit infringement. He did not receive the original draft of Bynum's book, as he only received the retyped article from Marquardt and reasonably assumed it was not an infringed piece of writing. Accordingly, we affirm dismissal of the contributory copyright infringement claims against Cannon and Stephenson for failure to state a claim.

## VI. Conclusion

For the foregoing reasons, we AFFIRM.